**[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 15.]**

THE STATE OF OHIO, APPELLEE, *v.* BAYS, APPELLANT.

[Cite as *State v. Bays*, 1999-Ohio-216.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-520—Submitted May 18, 1999—Decided October 13, 1999.)

APPEAL from the Court of Appeals for Greene County, No. 95-CA-118.

———————————

{¶ 1} On November 15, 1993, appellant, Richard Bays, robbed and murdered Charles Weaver. Bays was convicted of aggravated murder with a death specification and sentenced to death.

{¶ 2} Seventy-six-year-old Charles Weaver lived in Xenia with his wife Rose. On November 15, 1993, Weaver's daughter, Betty Reed, went to her parents' house to see if they needed anything. Betty Reed and Rose Weaver decided to do some shopping and left the house together sometime between noon and 12:30 p.m. Between 1:30 and 2:30 that afternoon, Iris Simms (who lived near the Weavers' house) saw a slim man in his late twenties, with shoulder-length brown hair, walk onto Weaver's porch and approach the door.[1]

{¶ 3} Howard Hargrave, an acquaintance of Richard Bays, was standing around with two other people on Xenia's Main Street that afternoon when Bays approached him, out of breath, and asked whether Hargrave "knew anyone that had any drugs." According to Hargrave, Bays appeared "nervous" and "kept looking around." Hargrave noticed a red stain on Bays's T-shirt that looked like blood.

{¶ 4} Betty Reed drove her mother home at about 5:30 p.m., accompanied by her son Michael. Dusk had fallen, and Betty noticed that no lights were on in

———————————

1. Simms did not identify Bays in court; however, her description of the man on the porch is consistent with Bays's appearance.

the house, not even "a flicker of a television set." This was unusual enough that she and her son decided to escort Mrs. Weaver inside.

{¶ 5} Michael Reed went in first. Turning on a light, he saw his grandfather's wheelchair standing empty. He then entered the kitchen. There he found Mr. Weaver lying on the floor. Michael told his mother to call 911.

{¶ 6} Paramedics arrived in response to the 911 call, found Mr. Weaver dead, and summoned Xenia police officers to the scene. Officers found a shattered plastic tape recorder and a large, square-shaped battery charger with blood on it. The bedroom was in extreme disarray—a "total shambles," Betty Reed later testified—with drawers pulled out and their contents dumped on the floor. The bedroom had not been in that condition when Betty Reed and Mrs. Weaver left the house that afternoon.

{¶ 7} Weaver's body was taken to the Montgomery County Coroner's Office. The ensuing autopsy showed that Weaver had suffered two stab wounds to the chest and three incised wounds on the neck. He also had several contusions, abrasions, and lacerations on top of his head, consistent with blows from a square, blunt object. The deputy coroner conducting the autopsy concluded that Weaver died of "a stab wound to the chest and blunt impact injuries to the head."

{¶ 8} On November 16, the day after the murder, Xenia police detective Daniel Savage decided to interview Richard Bays.

{¶ 9} At first, Bays told Savage that he had not been at Weaver's house on the day of the murder. However, Savage told Bays that someone had seen him there and that "if his [Bays's] prints matched the ones on Mr. Weaver's front door, then I [Savage] would be asking him to explain it." Bays then admitted that he had been at Weaver's house around 2:00 p.m. on November 15. He said he had coffee with Weaver, chatted, and left by 2:15.

{¶ 10} However, an inconsistency in Bays's statement aroused Savage's curiosity. Bays told Savage that Weaver had been sitting in his wheelchair during

Bays's visit and had not taken out his wallet. Yet Bays had also said that Weaver had the wallet in his back pocket during the visit. If Weaver was sitting in the wheelchair, Savage wondered, how could Bays have known that the wallet was in Weaver's back pocket?

{¶ 11} On November 19, an informant told Savage that Weaver's killer had dropped the wallet, along with some clothing he had worn during the crime, into a storm sewer near Bays's house. Based on this information, Savage and Detective Daniel Donahue interviewed Bays again on November 19. During this interview, Bays confessed to killing Weaver.

{¶ 12} Bays told the detectives that he went to Weaver's house after smoking some crack. He asked Weaver to lend him $30, but Weaver said he had no money. So Bays picked up the battery charger and hit Weaver on the head with it twice. When the battery charger's handle broke off, Bays started to run away, but then Weaver shouted that he was going to call the police. Bays then picked up a portable tape recorder and went back to hit Weaver on the head with it. The blow shattered the recorder, so Bays dropped it and attacked Weaver with a sharp kitchen knife. Bays admitted that he cut Weaver's throat and thought that he stabbed him in the chest.

{¶ 13} Weaver fell out of his wheelchair, and Bays took the wallet from Weaver's back pocket. Weaver's wallet contained $25 cash and $9 worth of food stamps. Bays then went into the bedroom and dumped out the contents of the drawers. Then he fled. He subsequently bought crack with Weaver's $25.

{¶ 14} Bays told the detectives that he threw Weaver's wallet down the storm sewer at the northwest corner of Second and Monroe Streets, along with the T-shirt and glove he had worn during the murder. At the end of Bays's statement, Savage placed him under arrest.

{¶ 15} When detectives searched the storm sewer at Second and Monroe, they found the T-shirt, glove, and wallet, just as Bays had said. Betty Reed, who

had given that wallet to her father, identified it in court.

{¶ 16} While held in the county jail, Bays discussed his crime with another inmate, Larry Adkins. Adkins testified that Bays had told him that he "hit [Weaver] with a battery charger" and when Weaver fell from his chair, Bays "took his wallet and * * * stabbed him in the chest. Then he was almost on his way out and he turned around and cut [Weaver's] throat * * * to make sure he wasn't alive."

{¶ 17} The Greene County Grand Jury indicted Bays on one count of aggravated murder under former R.C. 2903.01(A) and one under former R.C. 2903.01(B). Each count carried a felony-murder death specification under R.C. 2929.04(A)(7). The indictment also charged aggravated robbery.

{¶ 18} Bays waived a jury and was tried to a three-judge panel. On Bays's motion, with the state's acquiescence, the trial court dismissed the count charging aggravated murder under R.C. 2903.01(A). At trial, Bays offered no evidence in the guilt phase. The panel found Bays guilty of aggravated murder, R.C. 2903.01(B), and aggravated robbery. After a penalty hearing, the panel sentenced Bays to death. Bays appealed this judgment to the court of appeals, which affirmed the convictions and sentence.

{¶ 19} The cause is now before us upon an appeal as of right.

———————————

*David H. Bodiker*, Ohio Public Defender, *Stephen A. Ferrell* and *Angie Greene*, Assistant State Public Defenders, for appellant.

———————————

**ALICE ROBIE RESNICK, J.**

{¶ 20} Appellant raises fifteen propositions of law. For the reasons stated below, we find them without merit and therefore overrule all fifteen. We have also independently weighed the single aggravating circumstance against the mitigating factors and considered whether the sentence of death is disproportionate to sentences imposed in similar cases, as R.C. 2929.05(A) requires us to do. As a

4

result of our review, we affirm Bays's convictions and sentence of death.

## I

## Jury Waiver

**{¶ 21}** Bays signed a written jury waiver pursuant to R.C. 2945.05. After his counsel submitted the waiver to the trial court, the trial judge had the following exchange with Bays:

"JUDGE GRIGSBY: Now, Mr. Bays, I want to explain to you, you have a right to a Jury Trial of 12 people. That is your Constitutional right. If you sign this waiver of Jury Trial and begin the trial, there is no changing. You understand after a trial is begun, then you cannot go back and ask for a Jury?

"THE DEFENDANT: Yes.

"JUDGE GRIGSBY: Do you understand that?

"THE DEFENDANT: Yes.

"JUDGE GRIGSBY: Now, I want to ask you, you are not under any drugs or alcohol or anything like that this morning, are you?

"THE DEFENDANT: No.

"JUDGE GRIGSBY: This waiver must be made knowingly, and by that, I mean, you understand what you are doing. You are giving up your right to a Jury, and in a case like this, a Jury's verdict must be unanimous. In other words, if you convince, or your Counsel convinces one Juror not to convict you, there will at least be a mistrial and retrial.

"Do you understand you are giving up that right of the Jury?

"THE DEFENDANT: Yes, I understand that.

"JUDGE GRIGSBY: And is there any — well, just tell me why you want to give up the Jury.

"THE DEFENDANT: My Counsel feels it's best.

"JUDGE GRIGSBY: Now, are you doing this voluntarily, of your own free will?

"THE DEFENDANT: I don't know which way I want to go really. With the Jury, I don't figure it was a fair pick.

"JUDGE GRIGSBY: Well, regardless of whether you waive a Jury, whether it's this panel or another panel, are you giving up that right to a Jury Trial by your own volition?

"THE DEFENDANT: Yes.

"JUDGE GRIGSBY: Then the rule says you must sign that in open Court. I'm going to give you an unsigned copy and I want you to read it. If you have any questions, now is the time to ask them."

{¶ 22} Bays then signed another waiver, and the judge accepted it.

{¶ 23} In his first proposition of law, Bays contends that his waiver of trial by jury was not voluntary, knowing, and intelligent, and was therefore invalid.

{¶ 24} A jury waiver must be voluntary, knowing, and intelligent. *State v. Ruppert* (1978), 54 Ohio St.2d 263, 271, 8 O.O.3d 232, 236, 375 N.E.2d 1250, 1255. Waiver may not be presumed from a silent record; however, if the record shows a jury waiver, the verdict will not be set aside except on a plain showing that the waiver was not freely and intelligently made. *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 281, 63 S.Ct. 236, 242-243, 87 L.Ed. 268, 275-276. Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *United States v. Sammons* (C.A.6, 1990), 918 F.2d 592, 597; cf. *United States v. Martin* (C.A.6, 1983), 704 F.2d 267, 274, fn. 8.

Voluntariness

{¶ 25} Arguing that his waiver was not voluntary, Bays points out that he told the trial judge he was waiving because "[m]y counsel feels it's best," and that he did not "know which way [he] want[ed] to go." However, that Bays cited counsel's advice as a reason for waiving a jury does not suggest involuntariness. If anything, having the advice of counsel would enhance the voluntariness of his decision.

6

**{¶ 26}** Bays cites his own statement that he did not really know what he wanted as casting doubt on the voluntariness of his decision. Nevertheless, when asked if he was giving up his right to trial by jury "by your own volition," Bays said, "Yes." Bays asks us to discount this answer because, with an IQ of seventy-four, he could not be expected to know what "volition" meant. We are not persuaded. In context the word "volition" was comprehensible, coming (as it did) immediately after the preceding question: "Now, are you doing this voluntarily, of your own free will?"

**{¶ 27}** Bays has not shown that his jury waiver was not voluntary.

Knowingness and Intelligence

**{¶ 28}** Bays contends that his waiver was not knowing and intelligent, in that he did not understand the nature of the jury trial right and consequences of waiving it. During the colloquy, he stated: "With the Jury, I don't figure it was a fair pick." Bays argues that he was waiving a jury that he believed would be unfair, and thus did not understand that he was actually waiving the right to trial by a *fair* jury.

**{¶ 29}** A waiver is the intentional relinquishment of a known right or privilege. *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466. Hence, a defendant must have some knowledge of the nature of the jury trial right to make a valid waiver. *Martin, supra,* 704 F.2d at 273.

**{¶ 30}** However, a defendant need not have a complete or technical understanding of the jury trial right in order to knowingly and intelligently waive it. *Id*. For instance, the United States Court of Appeals for the Sixth Circuit has said: "A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and  * * * a judge alone will decide guilt or innocence should he waive his jury trial right." *Id.*, 704 F.2d at 273. Indeed, that may be more than the Constitution requires to

render a waiver knowing and intelligent. See *United States v. Sammons*, *supra*, 918 F.2d at 597. At any rate, a defendant need not be specifically told that he has a right to an *impartial* jury before his jury waiver can be deemed knowing and intelligent.

{¶ 31} Similarly, Bays also contends that his waiver was not knowing and intelligent because the trial court did not explain that a single juror can block a death recommendation, see *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96, and that a death sentence recommended by a jury could not be reimposed if reversed on appeal (as was then the case; see *State v. Penix* [1988], 32 Ohio St.3d 369, 513 N.E.2d 744, and R.C. 2929.06[B]). Again, however, these are not aspects of the jury trial right that a defendant must know about before he can knowingly and intelligently waive a jury trial. *Martin*, *supra*. The trial court is not required to inform the defendant of all the possible implications of waiver. See *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus.

{¶ 32} Bays further contends that his waiver was not knowing because the trial judge misinformed him as to the burden of persuasion in a jury trial. In explaining to Bays that "a Jury's verdict must be unanimous," the judge stated: "In other words, if you convince, or your Counsel convinces one Juror not to convict you, there would at least be a mistrial and a retrial."

{¶ 33} According to Bays, the trial judge's words implied that, if Bays asked for a jury trial, he would have to persuade the jurors of his innocence. Thus, he contends that the trial court affirmatively misinformed him about the nature of the jury trial right, a circumstance that generally invalidates a jury waiver. See *State v. Ruppert*, *supra; State v. Haight* (1994), 98 Ohio App.3d 639, 649 N.E.2d 294.

{¶ 34} However, the topic the judge was talking about here was the unanimity required for a jury verdict, not the allocation of the burden of proof. One could draw an incorrect inference about the burden of proof by minutely parsing the trial judge's words, but we find it hard to believe that a defendant would draw

any inference at all about the burden of proof from hearing these particular words spoken, in a context where the burden of proof was not the subject under discussion. Thus, we do not find that the trial court affirmatively misinformed Bays about the nature of the jury trial right.

{¶ 35} It does not plainly appear from the record that Bays's jury waiver was anything less than voluntary, knowing, and intelligent. Consequently, his first proposition of law fails.

II

Admissibility of Confession

{¶ 36} In his second proposition of law, Bays asserts that the trial court should have suppressed his November 19 confession to Detective Savage as involuntary. He contends that his will was overborne and the confession extracted by deceit, intimidation, and implied promises of leniency.

Findings of Fact

{¶ 37} In ruling on the motion, the trial court made detailed findings of fact, in accordance with Crim.R. 12(E). Since the record supports those findings, they bind us. See, *e.g.*, *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 981. Hence, we set them forth here, along with the supporting testimony.

{¶ 38} The trial court found that, on November 19, 1993, Savage received an anonymous call. The caller knew details of the murder that had not been released to the press, and he implicated Bays in the crime. "The police returned to Mr. Bays's home [the trial court found] and he again voluntarily accompanied the police to the police station. At the station Detective Donahue read Mr. Bays his rights and he again initialed the Pre-Interview form [acknowledging that he understood his rights]."

{¶ 39} The trial court found that Bays signed the form at 7:08 p.m. and gave the detectives a taped statement at 7:20 p.m. During the intervening twelve minutes, the detectives told Bays that they knew he committed the murder.

Detective Savage stated that "withholding the truth could only hurt [Bays] and not benefit him." Then the detectives told Bays how the murder happened. Bays admitted that the detectives' scenario was correct, then went over the details with them and reenacted the murder on videotape.

{¶ 40} The trial court further found that, during the interrogation, Savage "stated the different penalties for different crimes including the death sentence." At the hearing, Savage testified that he told Bays, "[I]t looked like a death penalty case." Savage then recited to Bays the possible penalties for aggravated murder, murder, manslaughter, and involuntary manslaughter.

{¶ 41} The trial court found that Savage had "raised the volume of his voice," but "[t]here was no evidence of screaming or of threats being made." Donahue testified that Savage raised his voice "a couple of times where Mr. Savage would say something to him and [Bays] would deny it, and he would say Ricky, we know better than that, you know, the lab has the results * * * or something like that."

{¶ 42} Savage testified that he "may have" struck the table with his hand, but he couldn't recall. He also testified that he told Bays that "his hair was at the scene in Mr. Weaver's hand [and] that somebody had seen him up on the porch that day and confirmed that he was there." These statements exaggerated the strength of the evidence against Bays, since the witness did not identify Bays on the porch and the hairs were never conclusively matched to Bays.

{¶ 43} The trial court found that "Mr. Bays is 28 years old, he has a tenth grade education and has demonstrated that he can read and write. Mr. Bays has prior criminal experience * * * ."

{¶ 44} The trial court concluded that Detective Savage's statements regarding the different penalties for different levels of homicide did not constitute a promise of leniency, nor did his statement that withholding the truth could only hurt Bays and not benefit him. Accordingly, the court found Bays's confession

voluntary and overruled his motion to suppress it.

Analysis

**{¶ 45}** "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances * * *." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus, judgment vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155. Circumstances to be considered include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."

**{¶ 46}** Several circumstances militate strongly in favor of finding the confession voluntary. Bays went to the station voluntarily. He was interrogated for only twelve minutes before confessing. He was in his late twenties and had been arrested before. There was no evidence of physical abuse or deprivation. Savage did raise his voice when he thought Bays was lying and may have hit the table as well, but there was no evidence of any direct threats. Bays heard his *Miranda* rights, acknowledged that he understood them, and signed a waiver, the validity of which is not challenged here. Savage testified that Bays was calm and did not seem nervous.

**{¶ 47}** Savage did mislead Bays as to the strength of the evidence against him. See *Frazier v. Cupp* (1969), 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97, 112. However, "[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *Ledbetter v. Edwards* (C.A.6, 1994), 35 F.3d 1062, 1070.

**{¶ 48}** Bays also points to his low IQ and childhood head injuries. Although this was not raised in the suppression hearing (see discussion below), the penalty-phase record shows that Bays's IQ was seventy-four, placing him in the

least intelligent five percent of the population. On the other hand, Bays had a tenth grade education, and the record indicates that he "did well in school" until he began engaging in substance abuse. There was no evidence that he was under the influence of any substances during the interrogation.

{¶ 49} We think that the factors pointing to voluntariness far outweigh those negating voluntariness. We therefore conclude that, under the totality of the circumstances, Bays's statement was voluntary.

{¶ 50} However, Bays also contends that, whatever the totality-of-the-circumstances analysis may show, his confession was involuntary because (as the trial court found) Savage informed him of the penalties for various degrees of homicide. According to Bays, these statements rendered his confession inadmissible, because they amounted to an implied promise of leniency.

{¶ 51} We cannot agree. A promise of leniency, while relevant to the totality-of-the-circumstances analysis, does not require that the confession be automatically suppressed. *Edwards*, 49 Ohio St.2d at 40-41, 3 O.O.3d at 23-24, 358 N.E.2d at 1058-1059.

{¶ 52} Moreover, Savage's recitation did not constitute a promise of leniency. All Savage did was to state the penalties for the various levels of homicide. An interrogator may inform the suspect of the penalties for the offense of which he is suspected. *State v. Arrington* (1984), 14 Ohio App.3d 111, 115, 14 OBR 125, 130, 470 N.E.2d 211, 216, citing *United States v. Ballard* (C.A.5, 1978), 586 F.2d 1060, 1063, and *United States v. Vera* (C.A.11, 1983), 701 F.2d 1349, 1364. We therefore reject Bays's contention that Savage, by informing him of the possible penalties he faced, rendered Bays's otherwise voluntary confession inadmissible.

Motion for New Suppression Hearing

{¶ 53} Bays also argues under his second proposition that the trial court denied him due process by denying his request for a *second* suppression hearing at

which he could present evidence of his mental deficits.

{¶ 54} Eighteen months after the trial court denied the motion to suppress, and less than a week before the scheduled trial date, the defense filed a renewed motion to suppress the confession. The motion requested a new hearing at which defense experts could testify on Bays's cocaine dependency, intellectual capacity, possible brain damage, and the effect of these things on the voluntariness of his confession. The defense also filed a motion for continuance grounded in the need to reopen the suppression hearing. (The defense had already requested and received two continuances.) On November 29, the court denied a continuance and a new hearing.

{¶ 55} We do not find that the trial court abused its discretion in denying Bays a second chance to litigate the voluntariness of his confession. We therefore overrule Bays's second proposition of law.

III

Evidentiary Sufficiency

{¶ 56} In his ninth proposition, Bays contends that, if we find his confession inadmissible, we must find that the *remaining* evidence is legally insufficient to sustain his conviction. Because we have found the confession admissible, this proposition of law is overruled as moot.

IV

Disclosure of Informant

**{¶ 57}** In his sixth proposition of law, Bays contends that the trial court should have ordered the state to disclose the identity of the informant who told Savage where Bays had discarded the shirt, glove, and wallet.

**{¶ 58}** At the suppression hearing Savage testified that, on November 19, "I received a phone call  * * * from an anonymous caller who had described the homicide to me.  They [*sic*] described how Mr. Weaver was killed, what instruments were used to murder him, who had done the killing, where evidence was from the scene that had been removed and where the clothing that Mr. Bays had worn were [*sic*] placed."

**{¶ 59}** Bays filed a motion for disclosure of the caller's identity, based on *Roviaro v. United States* (1957), 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. (Although the call to Savage was anonymous, Bays asserted that a deputy sheriff knew how to contact the caller.)  The trial court denied disclosure.

**{¶ 60}** Bays contends that the trial court should have ordered disclosure, or at least held an *in camera* review to determine whether the informant had information helpful to Bays's defense.

**{¶ 61}** The state has a privilege to withhold from disclosure the identities of those who give information to the police about crimes.  *State v. Beck* (1963), 175 Ohio St. 73, 76-77, 23 O.O.2d 377, 379, 191 N.E.2d 825, 828, reversed on other grounds (1964), 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142.  However, the privilege must give way where disclosure of the informant's identity would be helpful to the accused in making a defense to a criminal charge.  *Id.* at paragraph two of the syllabus; see, also, *Roviaro*, 353 U.S. at 60-61, 77 S.Ct. at 628, 1 L.Ed.2d at 645.

**{¶ 62}** In general, courts have compelled disclosure in cases involving "an informer who helped to set up the commission of the crime and who was present at its occurrence" whenever the informer's testimony may be helpful to the defense.

14

*Id*. at 61, 77 S.Ct. at 628, 1 L.Ed.2d at 645-646. For instance, *Roviaro* itself involved a controlled drug transaction between the defendant and the informant. See, also, *State v. Butler* (1984), 9 Ohio St.3d 156, 9 OBR 445, 459 N.E.2d 536; *State v. Williams* (1983), 4 Ohio St.3d 74, 4 OBR 196, 446 N.E.2d 779; *State v. Phillips* (1971), 27 Ohio St.2d 294, 56 O.O.2d 174, 272 N.E.2d 347.

**{¶ 63}** In contrast, "where the informant merely provided information concerning the offense," the courts "have quite consistently held that disclosure is not required." 3 LaFave & Israel, Criminal Procedure (1984) 19, Section 23.3. Cf. *Beck*, 175 Ohio St. at 77, 23 O.O.2d at 379, 191 N.E.2d at 828 (distinguishing *Roviaro*) with *Phillips*, 27 Ohio St.2d at 299-300, 56 O.O.2d at 177, 272 N.E.2d at 350-351 (distinguishing *Beck*).

**{¶ 64}** Bays suggests that this case falls within the former category rather than the latter. His argument is that the informant must have been either a witness, the perpetrator, or an accomplice because he gave such detailed information; moreover, the informant must have been "more than just an observer" because he knew exactly what items Bays had thrown down the sewer, even though Bays did this at night.

**{¶ 65}** We are not persuaded by this speculation. The facts Bays cites are entirely consistent with the inference that the informant learned about the crime from the killer. See *State v. Williams* (1995), 73 Ohio St.3d 153, 172, 652 N.E.2d 721, 736-737. In fact, that is the likelier scenario: Bays's statements to Detective Savage and to Larry Adkins mention no accomplice. So far as the record shows, Bays and Weaver appear to have been alone in the house.

**{¶ 66}** Bays has not shown that the informant did anything more than provide information concerning the offense. Hence, the trial court did not abuse its discretion by denying disclosure.

**{¶ 67}** Alternatively, Bays argues that the trial court should have conducted an *in camera* review to determine whether the informant's identity would have been

helpful. See *United States v. Sharp* (C.A.6, 1985), 778 F.2d 1182, 1187.[2] We disagree. "An in camera hearing is necessary only when 'the defendant makes an initial showing that the confidential informant may have evidence that would be relevant to the defendant's innocence.' " *State v. Allen* (1980), 27 Wash.App. 41, 48, 615 P.2d 526, 531, quoting *State v. Potter* (1980), 25 Wash.App. 624, 628, 611 P.2d 1282, 1284. Bays made no such showing here.

{¶ 68} Bays's sixth proposition is overruled.

V

Assignment of Probate Judge

{¶ 69} This case was tried to a panel of three judges designated by the presiding judge of the Greene County Common Pleas Court. That panel included Robert Hagler, a judge of that court's probate division, assigned pursuant to former C.P.Sup.R. 2, which was in effect at the time of the trial.[3] In his seventh proposition of law, Bays contends that, pursuant to R.C. 2945.06 and 2931.01(B),[4] a probate judge may not serve on a three-judge panel in a capital case.

{¶ 70} Bays did not object at trial to Judge Hagler's assignment. Hence, this issue is waived. Judge Hagler's assignment did not rise to the level of plain error, notwithstanding R.C. 2931.01(B), because, as Bays concedes, we rejected an argument similar to his in *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4,

---

2. At a November 29, 1995 hearing, one of the trial judges said that he would speak *in camera* with the deputy who allegedly knew the informant's identity, but there is no record of any such *in camera* interview.

3. The rule authorized the presiding judge of a court to "assign judges on a temporary basis from one division of the court to serve another division as the business of the court may require." Former C.P.Sup.R. 2 corresponds to present Sup.R. 3(B)(2).

4. R.C. 2945.06 provides that a defendant who waives jury trial "shall be tried by a court to be composed of three *judges*." (Emphasis added.)
   R.C. 2931.01(B) provides:
   "As used in Chapters 2931. to 2953. of the Revised Code:
   " * * *
   "(B) 'Judge' does not include the probate judge."

381 N.E.2d 190, paragraph four of the syllabus.

{¶ 71} Bays's seventh proposition of law is overruled.

VI

Other-Acts Evidence

{¶ 72} In his eighth proposition, Bays contends that state's witness Larry Adkins testified about irrelevant, inflammatory other acts by Bays, violating Evid.R. 404(B). Adkins testified that, when Bays told him about the murder, Bays said, "[I]f anybody is going to tell on me, I'm going to mess around and catch another murder case." Adkins also testified that Bays "was coming up with some ideas of framing a colored man." While Bays entered an objection to a latter portion of Adkins's testimony, he made no specific objection to the foregoing testimony. Thus, he waived this claim. Moreover, the law presumes that in a bench trial the court considers only relevant, material, and competent evidence. *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759. Bays's eighth proposition is therefore overruled.

VII

Ineffective Assistance

{¶ 73} In his tenth proposition, Bays claims that his trial counsel rendered ineffective assistance. To demonstrate ineffective assistance, Bays must show that, in light of all circumstances, counsel's performance fell below an objective standard of reasonable representation. He must also show prejudice, *i.e.*, a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See *Strickland v. Washington* (1984), 466 U.S. 668, 687-694, 104 S.Ct. 2052, 2064-2068, 80 L.Ed.2d 674, 693-698; *State v. Bradley* (1989), 42 Ohio St.3d 136, 142-143, 538 N.E.2d 373, 380, and paragraphs two and three of the syllabus.

{¶ 74} Bays cites six instances of allegedly ineffective assistance.

**{¶ 75}** (1) When the trial court asked Bays why he wanted to waive the jury, Bays said, "My Counsel feels it's best." On being asked whether he waived jury trial of his own free will, Bays replied, "I don't know which way I want to go really. With the Jury, I don't figure it was a fair pick."

**{¶ 76}** Bays contends that "[i]f counsel had advised Bays to waive his rights because of perceived bias by the jury, counsel had a duty to raise an objection with the court." However, the record does not show whether this was counsel's reason for advising Bays to waive a jury. What the record does show is that counsel *did* "raise an objection with the court"; on December 6, 1995, counsel filed a motion to dismiss the venire, alleging that it was not randomly selected. (Bays waived jury trial later that day, rendering the motion moot.)

**{¶ 77}** Bays notes that the record does not reflect that counsel advised him of the consequences of waiving the jury. However, it is Bays's burden to show that counsel rendered ineffective assistance. *Strickland; Bradley*, *supra*. The fact that counsel did not advise Bays on the record hardly suggests that counsel failed to advise him at all. It is a normal practice for lawyers to advise their clients in private, rather than on the record. Bays has failed to affirmatively show that his lawyer did not advise him.

**{¶ 78}** Bays further contends that his counsel had a duty to ensure that the trial court advised him of the consequences of waiver, inquired more deeply into the voluntariness of his waiver, and used simpler language. However, such a colloquy is not required for a valid jury waiver. *State v. Jells*, *supra*, 53 Ohio St.3d at 25-26, 559 N.E.2d at 468.

**{¶ 79}** (2) Bays claims that his counsel should have objected to the presence of a probate judge on the panel, based on R.C. 2931.01. However, *State v. Cotton*, *supra*, 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, had rejected a similar claim. It follows that counsel had no duty to object to the presence of the probate judge, for "[i]t is not ineffective assistance for a trial lawyer to maneuver within the

existing law, declining to present untested or rejected legal theories." *State v. McNeill* (1998), 83 Ohio St.3d 438, 449, 700 N.E.2d 596, 607.

{¶ 80} (3) Detective Savage testified that the blood stains found at the crime scene displayed "directional patterns" that showed how many times the victim was struck. Bays argues that trial counsel should have objected to this evidence under Evid.R. 403(A) as inflammatory and cumulative.

{¶ 81} Under Evid.R. 403(A), as applied to death penalty cases by *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267, 273-274, the trial court must exclude evidence if its probative value does not outweigh the danger of unfair prejudice. Even in a jury trial, this is a difficult standard to meet, and broad discretion is vested in the trial judge. See *State v. Rahman* (1986), 23 Ohio St.3d 146, 152, 23 OBR 315, 320, 492 N.E.2d 401, 407; *State v. McGuire* (1998), 80 Ohio St.3d 390, 400, 686 N.E.2d 1112, 1121. Thus, counsel could rarely (if ever) be deemed ineffective for failing to object under Evid.R. 403(A). But this was a bench trial, in which the court is presumed to have considered only the relevant, material, and competent evidence. *State v. Post*, *supra,* 32 Ohio St.3d at 384, 513 N.E.2d at 759. Hence, "[c]ounsel could reasonably assume that the judge[s] would be unaffected by any inflammatory material * * *." *State v. Campbell* (1994), 69 Ohio St.3d 38, 43, 630 N.E.2d 339, 346.

{¶ 82} (4) Bays contends that his trial counsel should have asked for the appointment of a defense investigator under R.C. 2929.024. However, the record does not disclose what investigations trial counsel actually performed or failed to perform, or what information an investigator might have turned up that the defense in fact failed to obtain. See *State v. Hutton* (1990), 53 Ohio St.3d 36, 42, 559 N.E.2d 432, 441. Hence, on this record Bays's claim of prejudice from counsel's failure to employ investigative services is speculative.

{¶ 83} (5) Bays claims that his counsel should have objected to the *en bloc* admission of all guilt-phase evidence in the penalty phase. See *State v. Getsy*

(1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866, 887.  However, Bays fails to point to any specific guilt-phase evidence that should have been excluded from the penalty phase as irrelevant.  Thus, he has shown neither attorney error nor prejudice.  Moreover, as previously noted, in a bench trial we presume that the court considered only the relevant, material, and competent evidence.  *Post*, *supra,* 32 Ohio St.3d at 384, 513 N.E.2d at 759.

{¶ 84} (6) Bays contends that his counsel "failed  * * * to fully present evidence in mitigation that was available to them."  First, Bays notes that he did not give an unsworn statement in the penalty phase.  However, Bays stated at trial that he did not wish to make an unsworn statement.  Nothing in the record shows that Bays's counsel were responsible for this decision.  Hence, Bays cannot make the showing *Strickland* requires.

{¶ 85} Bays also points out that his wife and father did not directly ask the court to spare his life.  But their testimony made it clear that they loved and supported him.  Express pleas for mercy would have added little to  their testimony.  Finally, he contends that his trial counsel did not elicit from Bays's wife and father any personal history that would have illustrated his cognitive difficulties and presented him as a unique human being.  But the witnesses did testify about Bays's personal history, and three expert witnesses supplied evidence of his mental and cognitive difficulties and chemical dependence.

{¶ 86} Bays's tenth proposition is found to be without merit and is overruled.

{¶ 87} In his twelfth proposition, Bays claims ineffective assistance of appellate counsel in the court of appeals.  See, generally, *Evitts v. Lucey* (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821; *State v. Watson* (1991), 61 Ohio St.3d 1, 16, 572 N.E.2d 97, 109.  Bays cites five issues that he claims appellate counsel should have raised.

{¶ 88} Item 1 on Bays's list of overlooked appellate issues (corresponding

to the third proposition of law in Bays's brief to this court) alleges that appellate counsel should have attacked certain errors in the trial court's sentencing opinion. However, in view of our independent reweighing below, there is no prejudice.

{¶ 89} Items 2 (reasonable-doubt definition), 3 (vagueness), and 4 (prosecutorial misconduct) correspond to Bays's thirteenth, fourteenth, and eleventh propositions of law, respectively. However, trial counsel failed to raise these alleged errors. Since the issues were waived at trial, appellate counsel could reasonably decide not to pursue them in the court of appeals.

{¶ 90} In Item 5, Bays claims that appellate counsel were ineffective because they failed to raise ineffective-assistance claims concerning trial counsel's failure to object to the alleged errors set forth in Items 2, 3, and 4. However, appellate counsel did raise ten other issues attacking trial counsel's performance. There is nothing to suggest that appellate counsel did not simply select what they regarded as issues on which Bays would most likely prevail.

{¶ 91} Bays's claims in Items 2 and 3 are inconsistent with existing law. As for Item 4, it was not such a strong issue that a reasonable attorney would necessarily raise it. Since this was a bench trial, it would have been difficult for appellate counsel to show that trial counsel prejudiced Bays by not objecting to the alleged prosecutorial misconduct. See *Post*, 32 Ohio St.3d at 384, 513 N.E.2d at 759; *Campbell,* 69 Ohio St.3d at 43, 630 N.E.2d at 346.

VIII

Prosecutorial Misconduct

{¶ 92} In his eleventh proposition, Bays claims prosecutorial misconduct. However, Bays did not object to the misconduct at trial or raise it in the court of appeals. His claims are therefore waived. See, generally, *State v. Williams* (1977), 51 Ohio St.2d 112, 116-118, 5 O.O.3d 98, 100-101, 364 N.E.2d 1364, 1367-1368, and paragraphs one and two of the syllabus. None of the alleged errors fits the definition of plain error set forth in Crim.R. 52 and elaborated in *State v. Long*

(1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.  Hence, we overrule Bays's eleventh proposition.

IX

Sentencing Opinion

{¶ 93} In his third proposition of law, Bays points out errors in the panel's sentencing opinion.

{¶ 94} The panel referred to "aggravating circumstances" in the plural, even though there was only one.  However, this was a minor mistake.  The panel correctly identified the single aggravating circumstance in the opinion.  Its incorrect use of the plural is not a basis to conclude that the court was considering nonstatutory aggravating circumstances.  *State v. Jells*, *supra*, 53 Ohio St.3d at 33-34, 559 N.E.2d at 475-476.

{¶ 95} The panel committed three other errors, however.  First, instead of weighing the mitigating factors collectively against the aggravating circumstance, the panel weighed each proffered factor individually against the aggravating circumstance.  Second, the panel concluded that each of the mitigating factors considered "does not outweigh the aggravating circumstances that the defendant has been found guilty of committing."  This improperly placed the burden on the defendant to prove that mitigation outweighed aggravation, whereas R.C. 2929.03(D)(2) and (D)(3) require the state to prove that the aggravating circumstance outweighs the mitigating factors.  Finally, the panel considered the evidence relating to Bays's brain damage and retardation only under R.C. 2929.04(B)(3) (diminished capacity) and not under (B)(7) (catchall).

{¶ 96} The errors noted in this proposition can be cured by this court's independent review.  See, generally, *Clemons v. Mississippi* (1990), 494 U.S. 738, 745, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725, 736; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304.  Thus, Bays's third proposition is overruled.

X

Appellate Opinion

**{¶ 97}** In his fourth proposition of law, Bays contends that the court of appeals erred by relying upon extra-record material in its independent review of the death sentence.

**{¶ 98}** In considering how much weight Bays's crack addiction should be given in mitigation of sentence, the court of appeals quoted at length from Waldorf, Reinarman & Murphy (1991), Cocaine Changes: The Experience of Using and Quitting, a work "based on a two-year study of 267 cocaine users." The authors found that cocaine addiction can influence users to commit crimes in order to obtain the drug, but that users who are already involved in criminal activities are more likely to do so than users who are not. The authors cautiously describe their conclusions as "a hypothesis worthy of further investigation" and warn that "[w]e cannot overgeneralize here because we cannot 'prove' anything with fifty-three subjects."

**{¶ 99}** Nevertheless, based on the hypothesis set forth in Cocaine Changes, the court of appeals found that Bays's addiction was not a significant mitigating factor in this case. Bays contends that the court of appeals could not properly base its conclusions on that hypothesis, since the merits of the hypothesis were not presented at trial.

**{¶ 100}** We agree. Although, as the court of appeals observed, sentencing judges may draw upon their experiences in making factual determinations, see *Barclay v. Florida* (1983), 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134, 1144, that is not what happened here. Instead, the court of appeals based its factual conclusions upon what amounted to an expert opinion, which should have been subjected to adversarial testing.[5] See *Gardner v. Florida* (1977), 430 U.S.

---

5. Since the book's conclusions were used as a basis for drawing case-specific factual inferences about the relation between Bays's addiction and his behavior, this case does not involve judicial notice of "legislative facts." See Staff Note to Evid.R. 201(A).

349, 360-362, 97 S.Ct. 1197, 1205-1207, 51 L.Ed.2d 393, 403-404.

{¶ 101} Now that the error has been called to our attention, we can cure it by not considering the extra-record material in our own independent review of the sentence. See *State v. Clark* (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844, 856. Consequently, this proposition is overruled.

## XI

### Settled Issues

{¶ 102} In his thirteenth proposition, Bays challenges the R.C. 2901.05(D) definition of reasonable doubt, which the panel applied in this case. However, Bays failed to raise this issue at trial, waiving it.

{¶ 103} We reject Bays's fourteenth proposition on authority of *State v. Gumm* (1995), 73 Ohio St.3d 413, 416-418, 653 N.E.2d 253, 259-260.

{¶ 104} Bays's fifteenth proposition attacks the constitutionality of the Ohio death-penalty scheme. His claim that electrocution violates the Eighth Amendment lacks merit. *In re Kemmler* (1890), 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519; *In re Sapp* (C.A.6, 1997), 118 F.3d 460, 464 (citing cases). Moreover, a condemned prisoner may elect to be executed by lethal injection, R.C. 2949.22(B)(1); thus, if Bays objects to electrocution as a mode of execution, he need not submit to it. See *Stewart v. LaGrand* (1999), 526 U.S. 115, ___, 119 S.Ct. 1018, 1020, 143 L.Ed.2d 196, 201 (condemned prisoner who chose lethal gas waived claim that execution by lethal gas violated Eighth Amendment).

{¶ 105} Bays's other claims we summarily reject. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 167-171, 173-174, 15 OBR 311, 314-317, 318-320, 473 N.E.2d 264, 272-274, 277-278; *State v. Buell* (1986), 22 Ohio St.3d 124, 137-138, 22 OBR 203, 214-215, 489 N.E.2d 795, 807-808; *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 103-104, 656 N.E.2d 643, 669, 671.

## XII

### Independent Review

{¶ 106} In Bays's fifth proposition of law, he contends that the aggravating circumstance does not outweigh the mitigating factors beyond a reasonable doubt and that the death sentence is not proportionate to sentences approved in similar cases. We now proceed to determine these issues in our statutorily mandated independent review of Bays's death sentence.

Aggravating Circumstance

{¶ 107} The sole aggravating circumstance is that Bays committed the murder while committing aggravated robbery. R.C. 2929.04(A)(7). The evidence is sufficient to prove this circumstance. (See discussion of Bays's ninth proposition of law, above.)

Mitigating Factors

{¶ 108} In the penalty phase, Bays presented testimony from his father, his wife, and three expert witnesses.

{¶ 109} Dr. Newton Jackson, a forensic psychologist, performed numerous psychological tests on Bays, including the WAIS-R intelligence test, the MMPI-2, and the Rorschach test. Bays's IQ was seventy-four, placing him in the borderline intellectual range, between normal and retarded. Bays had no major behavioral or personality disorder and did not appear to be psychotic. However, he did suffer from "chronic * * * inadequacy * * * to deal with the complexities of life," symptomatized by depression and anxiety. The SMDT and Bender tests "strongly indicated * * * organic brain dysfunction."

{¶ 110} Dr. Kathleen Burch, a clinical psychologist, is an expert in neuropathological assessment. She reviewed Bays's medical records, school records, and the results of Jackson's psychological examination of Bays. She also performed an extensive battery of tests on him. Her results were consistent with a "moderate level of neuropsychological dysfunction."

{¶ 111} According to Bays's medical records, his umbilical cord was compressed during birth, resulting in apparent brain damage. At age six, Bays

suffered a head injury and possible concussion. These injuries could have accounted for Bays's intellectual deficits.

{¶ 112} However, Dr. Burch testified that Bays did not exhibit the type of deficits that would suggest damage to his frontal lobes, which are responsible for "mature behaviors, the ability to deny gratification of impulses, the ability to plan and organize behavior."

{¶ 113} Dr. Harvey Siegal performed a "chemical dependency assessment" on Bays. He concluded that Bays was dependent on marijuana and crack. Siegal related some of Bays's history of substance abuse. Bays was "drinking consistently" from the age of twelve or thirteen and using marijuana daily since his teen years. Bays married at twenty and gave up heavy drinking, but continued to use marijuana. He began using crack around the time of his mother's death in 1992.

{¶ 114} Bays's wife Martha testified that Bays had three children, one aged nine and two aged eight. Mrs. Bays told how, in 1985, she resolved to stop drinking and issued an ultimatum to Bays that he do likewise, or she would leave him. Bays did stop heavy drinking, but continued to use marijuana (and crack, although Mrs. Bays was unaware of it).

{¶ 115} Bays's father testified that Bays's birth had involved "complications," that he "had some falls" as a child, and that he had some academic problems. He testified that Bays "was kind of lost" when his mother died.

{¶ 116} Bays's wife and father both kept in touch with him with phone calls and visits during his incarceration. Mrs. Bays and her children visited Bays every week. Bays has never assaulted his wife, children or stepchildren, his wife said.

{¶ 117} The parties stipulated to Bays's criminal record. In 1982, Bays was adjudged delinquent for burglary. He had eight misdemeanor convictions between 1983 and 1985: four convictions of operating a motor vehicle under the influence of alcohol, two of disorderly conduct, one of unauthorized use of property, and one of driving under suspension. We find this record entitled to little weight in

mitigation under R.C. 2929.04(B)(5).

{¶ 118} Bays has no history of violent behavior. Moreover, Dr. Jackson testified that Bays does not exhibit "any characteristics of a psychopath or an individual who is call[o]used towards others, or a person who * * * chronically engages in assaultive or impulsive behavior." We accord this evidence weight as a mitigating factor under R.C. 2929.04(B)(7).

{¶ 119} Bays's cocaine addiction is also a (B)(7) mitigating factor. See *State v. Hill* (1995), 73 Ohio St.3d 433, 447, 653 N.E.2d 271, 284. Moreover, Bays said in his confession that he smoked crack before the murder. That is another mitigating factor, but a weak one. See, *e.g.*, *State v. Otte* (1996), 74 Ohio St.3d 555, 568, 660 N.E.2d 711, 723.

{¶ 120} Bays's below-average intelligence, caused by brain damage, is also a (B)(7) mitigating factor. See, *e.g.*, *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387. However, we assign it little weight.

{¶ 121} Bays claims the nature and circumstances of the crime were mitigating because the crime was impulsive. That is not entirely true, however. The initial assault may well have been impulsive, but when Weaver threatened to summon the police, Bays turned back and silenced him with five knife wounds.

{¶ 122} Bays readily confessed to police on November 19, though only after lying to them on November 16. His cooperation is entitled to some weight. So are his family's love and support.

{¶ 123} Despite the presence of some mitigating factors in this case, we find that, beyond a reasonable doubt, the robbery-murder aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 124} The final step in our analysis is proportionality review. Bays's sentence is proportionate to death sentences affirmed in other robbery-murder cases. See, *e.g.*, *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; *State v. Allen* (1995), 73 Ohio St.3d 626, 653 N.E.2d 675; *State v. Hill*, *supra*, 73 Ohio

St.3d 433, 653 N.E.2d 271.

{¶ 125} Based upon the foregoing, we find the death sentence in this case to be appropriate and proportionate.

{¶ 126} The judgment of the court of appeals, upholding Bays's convictions and death sentence, is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____