Defendant-appellant, Kathleen A. Witte, appeals from a judgment of the Franklin County Court of Common Pleas finding her guilty of aggravated murder in violation of R.C. 2903.01, and conspiracy to commit aggravated murder in violation of R.C.2923.01 as applied to R.C. 2903.01.
By indictment filed May 26, 1998, defendant was charged with (1) purposely, and with prior calculation and design, causing the death of Richard Witte, and (2) conspiring to commit the aggravated murder of Richard Witte. The matter was tried to a jury, which found defendant guilty of both counts. The trial court merged the two offenses for sentencing, the state elected to have defendant sentenced on the first count, and the trial court sentenced defendant to twenty years to life. Defendant appeals, assigning the following errors:
I. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ADMITTED THE HEARSAY STATEMENTS OF KEVIN WITTE.
II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING APPELLANT'S MOTION TO SUPPRESS STATEMENTS MADE BY DEFENDANT.
III. APPELLANT WAS NOT PROVIDED EFFECTIVE ASSISTANCE OF COUNSEL.
Defendant's first assignment of error asserts the trial court committed plain error and violated Evid.R. 801(D)(2)(e) in allowing Kevin Witte ("Kevin") to testify to statements Justin Coleman made concerning defendant's involvement in the murder of her husband, Richard Witte ("decedent").
Before addressing the merits of defendant's first assignment of error, we note defendant failed to object to the testimony subject of the assigned error, and thus waived all but plain error in the admission of the testimony. Accordingly, we consider defendant's contentions under a "plain error" standard of review. "[A]n alleged error `does not constitute a plain error or defect under Crim.R. 52(B), unless, but for the error, the outcome of the trial clearly would have been otherwise.'" State v.Campbell (1994), 69 Ohio St.3d 38, 41, citing State v. Long
(1978), 53 Ohio St.2d 91.
Under Evid.R. 801(C), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(D), however, excepts a statement from the hearsay rule if the statement is offered against a party and is "(e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." "Thus, pursuant to the express terms of the rule, the statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." State v. Carter (1995), 72 Ohio St.3d 545,550. See, also, State v. Milo (1982), 6 Ohio App.3d 19, 22
(holding that the "plain language of Evid. R. 801(D)(2)(e) indicates that the co-conspirator rule applies if five conditions are established: (1) The existence of a conspiracy; (2) The defendant's participation in the conspiracy; (3) The declarant's participation in the conspiracy; (4) The statement was made during the course of the conspiracy; and (5) The statement was in furtherance of the conspiracy"); Giannelli, Ohio Evidence Manual (1982), Section 801.15.
Defendant's first assignment of error thus resolves to a contention that the trial court erred in failing to find independent evidence of the conspiracy before allowing Kevin to testify to Justin Coleman's statements. Contrary to defendant's contentions, the state presented, through Kevin, considerable evidence of a conspiracy before eliciting hearsay testimony from him concerning Coleman's statements.
Specifically, Kevin began by testifying to difficulties he had had with decedent concerning decedent's reaction to Kevin's conduct. He discussed the matter on occasion with defendant, who told him that "one of these days he [decedent] won't be there, it would be okay." (Tr. 428.) The conversations ultimately progressed from her mentioning she would get a divorce but could not afford it, to defendant's talking about decedent's health problems and hoping he would have a heart attack.
Defendant then began to speak of poisoning decedent and discussed putting some kind of rat poison in his vitamins. The conversations ultimately turned to killing decedent. Defendant asked if Kevin knew anyone that would "get rid of" her husband, and she asked Kevin if he could arrange a meeting between her and that person. (Tr. 444.)
As a result of defendant's requests, Kevin first talked to his friend, David Benson. Benson said he would be "happy to do it" and to get some of his friends in on it. (Tr. 445.) Although Kevin made the arrangements for Benson to meet with and speak to defendant, Benson met with defendant outside of Kevin's presence. Defendant, however, decided Benson as unreliable because he kept saying he would do things which he could not do.
When that plan fell through, "things were kind of put on hold for a while until [Kevin] had a couple of friends come over." (Tr. 448.) Defendant mentioned killing her husband to Andy Crosby. Coleman also was present, heard the statement, and commented about it. Defendant asked Kevin if Coleman would perform the killing, and Kevin told her he would ask Coleman. The next day, Kevin pulled Coleman aside; Kevin told Coleman that he and defendant wanted Coleman to do something for them. When Coleman asked what that was, Kevin replied that they "wanted Rick dead." (Tr. 449.) Defendant contends Coleman's response, that he would see what he could do, was inadmissible.
Contrary to defendant's contentions, Kevin's testimony constitutes sufficient independent proof of a conspiracy to allow Coleman's hearsay statements to be admitted. Unquestionably, the evidence establishes a conspiracy between Kevin and defendant to have decedent killed, and further demonstrates the sequence of events which led to the ultimate configuration of conspirators. While Kevin testified to defendant's contemplating Benson and Crosby as potential conspirators, in each instance he indicated that their involvement never came to fruition. However, no such testimony exists regarding Coleman, and thus the testimony is sufficient to establish a prima facie case of conspiracy demonstrated by proof independent of Coleman's hearsay statements. Accordingly, the trial court did not err when it allowed Kevin to testify to Coleman's hearsay statement that, in response to Kevin's inquiry, Coleman said that he would see what he could do.
Subsequent to that statement, Kevin testified further to Coleman's involvement with defendant as a co-conspirator. For example, Coleman decided for Kevin's own safety that Kevin was not to have any information about the person Coleman would contact to perform the murder. Rather, defendant was to say she wanted Kevin at work that night. Defendant's involvement was further clarified when Kevin testified defendant discussed the area where decedent's body should be dropped, even offering a map to the area. She further specified the murder should be committed the night she was leaving for Toledo, said she needed additional meetings with Coleman, and then met with Coleman from four to seven times.
Moreover, even if the trial court erred in allowing Kevin to testify to Coleman's hearsay statement, the error does not rise to plain error. Admission of Coleman's response, "he would see what he could do," in and of itself is not so damaging that the outcome of the trial clearly would have been different but for its admission, especially in view of defendant's taped confession being played for the jury. See State v. Carter, supra,
(finding that any error in allowing a co-conspirator's hearsay statement for lack of independent proof of the conspiracy prior to admission of the hearsay statement may be harmless).
On similar grounds, defendant next contests what she asserts was Coleman's hearsay testimony: "Justin just wanted to have a good prom night." (Tr. 453.) While Kevin testified to the statement, the record is less than clear whose statement it is. However, even if it was Coleman's, it was made in furtherance of the conspiracy, as Coleman said "he would personally do the hit for a hundred dollars." (Tr. 453.) Similarly, Coleman's statements, related through Kevin's testimony, concerning just how Kevin should go about murdering the victim, also were made in furtherance of the conspiracy.
Lastly, defendant contests Coleman's statement, related again through Kevin, that "[h]e then told me that mom had said if she didn't love Justin before she does now." (Tr. 491.) Again, however, the statement was made in furtherance of the conspiracy. At that point, Kevin and Coleman had murdered decedent, but had not yet disposed of the body. Coleman contacted defendant, who, in continued pursuit of the conspiracy, approved the actions Coleman had taken thus far through her statement now at issue. Accordingly, the trial court did not err in allowing Kevin to testify to Coleman's hearsay statement which incorporated defendant's remarks in support of the conspirators' actions.
For the foregoing reasons, defendant's first assignment of error is overruled.
Defendant's second assignment of error asserts the trial court erred in overruling her motion to suppress her statements made to the police. Although defendant was advised of her rights under Miranda v. Arizona (1966), 384 U.S. 436, defendant contends that compliance with the formalistic requirements of Miranda is insufficient, as her statements were not voluntarily obtained.
"In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances * * *." State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, judgment vacated on other grounds (1978), 438 U.S. 911; State v. Bays (1999), 87 Ohio St.3d 15. Circumstances to be considered include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment, and the existence of threat or inducement." Edwards, supra.
In support of her assigned error, defendant points to the extenuating circumstances of (1) having learned that her son murdered her husband and the subsequent need to identify her husband's body at the morgue, (2) the detective's becoming quite "vocal" with her during the course of the interrogation, (3) the detective's not informing her that she was free to leave during the interview, (4) the detective's advising her that "the only chance your son's got, (inaudible) is for you to be truthful with us," (Tr. 848), and (5) the detective's statement, made at the time her Miranda rights waiver was presented, that he hoped she was "human being enough to take care of what is actually your responsibility and try to help your son, the only decent thing you can do right now. If you don't do that, I'm telling right (inaudible) I'll come down on you very hard. You'll go away for the rest of your life. Do you understand that?" (Tr. 848.)
While defendant contends the length, intensity and frequency of the interrogation, coupled with the existence of threats or inducement, produced an involuntary statement from her, the record does not support defendant's contentions. As she notes, defendant was subjected to multiple interviews, yet in all but the last interview defendant was not a suspect and was free to leave. Defendant nonetheless contends she was never told she was free to leave, and therefore felt constrained. The record undermines defendant's argument, as it indicates defendant not only was permitted to go outside to smoke, but rather than being constrained to stay, was placed in a position where she could easily have left: because the door behind her locked, defendant needed to notify someone in order to re-enter the building. In a later interview, she was again permitted to take smoking breaks and to make several telephone calls. Only after she became a suspect, was administered her Miranda rights, and had waived them, was her freedom to leave curtailed.
Defendant also focuses on the detective's statements to her, suggesting those statements concerning her son and her responsibility to him were so coercive as to induce an involuntary statement. Initially, to the extent defendant contends the detective mislead or lied to her, "that would not necessarily make [defendant's] statements involuntary. The use of deceit is merely `* * * a factor bearing on voluntariness.'" State v. Cooey (1989),46 Ohio St.3d 20, 27, quoting Schmidt v. Hewitt (C.A.3, 1978),573 F.2d 794, 801.
Moreover, to the extent defendant contends the statement advising her to help her son and avoid life imprisonment were unduly coercive due to the circumstances she endured that day, the contention ultimately is not persuasive on this record. In Statev. Loza (1994), 71 Ohio St.3d 61, the Supreme Court found no impermissible coercion in detectives' playing on Loza's strong feelings for his girlfriend and his unborn child in attempting to secure a confession. The detective's reference here to defendant's responsibility to her son is no more coercive than the detectives' admonition in Loza to that it would be in the unborn baby's best interest if he told the truth.
Next, to the extent defendant contends she was threatened by the detective's general admonitions, her contentions are unpersuasive. Similar statements were found to be permissible tactics in Cooey, where officers warned Cooey that if he lied, he had "buried" himself. See, also, United States v. Barfield (C.A.5, 1975), 507 F.2d 53 (where defendant's being told that it would be in "his best interest" to tell the "real story," whereas lying might leave him "holding the bag," were neither threats nor promises, but permissible admonitions to tell the truth). The statements defendant cites are no more a threat than those noted in Cooey and Barfield.
Nonetheless, the detective arguably went beyond merely advising defendant of the potential penalties for her conduct, and instead threatened her when he told her he would see she got life imprisonment if she did not do the "decent thing." Cf. State v.Bays (1999), 87 Ohio St.3d 15, 23 (finding that informing defendant of penalties for various degrees of homicide did not render confession involuntary). Even if, however, those statements go beyond the facts of Bays, defendant did not testify at the suppression hearing, and thus the record contains no evidence to contradict defendant's statement that her answers to questions were not the result of promises, threats or pressure of any kind.
Finally, to the extent defendant contends the duration of her presence at law enforcement facilities overcame her will, the record once more fails to support her contentions. Without question, defendant was in contact with law enforcement over an extended period of time during the day she ultimately rendered her statement. However, much of that time was spent in discussions where defendant was able to make phone calls, take smoking breaks, and leave according to her will. Only the last segment of the day, at around 8:15 p.m., did she become a suspect. At that time, she had been questioned in the interview room for approximately thirty-five minutes. When she began to make incriminating statements, she was advised of her Miranda rights, which she waived. Thereafter, she was interviewed for less than an hour. Under those circumstances, although defendant was in the proximity of law enforcement personnel for much of the day, her freedom was not restricted until the final interview. Accordingly, the record fails to support a coercive affect from the duration of her contact with law enforcement officials.
Given the foregoing, defendant's second assignment of error is overruled.
Defendant's third assignment of error contends she was deprived of effective assistance of counsel. "To demonstrate ineffective assistance [defendant] must show that, in light of all the circumstances, counsel's performance fell below an objective standard of reasonable representation. [Defendant] must also show prejudice, i.e., a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Bays, supra, at 27, citing Strickland v. Washington (1984), 466 U.S. 668, 687-694.
Defendant contends counsel was ineffective in failing to cross-examine Detective Kallay at the suppression hearing concerning factors traditionally considered in determining the voluntariness of defendant's statements: the age, mentality, and prior criminal experience of defendant, the intensity of the interrogation, and the threats made to defendant. Similarly, defendant contends counsel was ineffective in not presenting her as a witness to address her subjective feelings of coercion as a result of the officer's tactics.
The assigned error, however, invites us to speculate about the answers which may have been given had Detective Kallay been cross-examined regarding the enumerated factors, or had defendant been made a witness at the hearing. Even if defendant's trial counsel may have been deficient in handling those matters, the record lacks evidence of what Detective Kallay or defendant may have stated, and thus fails to reflect prejudice to defendant by counsel's failure. To the extent defendant may be able to show prejudice by evidence outside the record, her remedy is in a petition for post-conviction relief.
Accordingly, defendant's third assignment of error is overruled.
Having overruled defendant's three assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
TYACK and PETREE, JJ., concur.