OPINION
{¶ 1} This is an appeal from the judgment of Seneca County Common Pleas Court which denied defendant-appellant, Benjamin L. Greeno's ("Greeno") motion to suppress statements made to police officers during a criminal investigation.
 {¶ 2} On July 4, 2002, a fire destroyed the Doeshire Inn in Fostoria, Ohio, killing two people. The Fostoria Police Department in conjunction with the State Fire Marshall's Office and the U.S. Bureau of Alcohol Tobacco and Firearms ("ATF") conducted a criminal investigation. While investigating the fire, a witness placed Greeno on the second floor of the Doeshire Inn minutes before the fire began in a second floor bathroom.
 {¶ 3} On July 6, 2002, Fostoria Police Detective, Michael Clark and ATF agent, Pete Elliott, (together "officers") questioned Greeno at his home. At that time, Elliott gave his business card to Greeno and told him to call him if anything suspicious happened. On July 9, 2001, the witness who had identified Greeno as being present at the Doeshire Inn, known only as "Billy" to Greeno, went to Greeno's home and talked to him about the fire. Thereafter, Greeno called Elliott to inform him of "Billy's" visit. Upon returning Greeno's call, Elliott suggested that he come to Greeno's home so that they could talk. On July 10, 2002, Elliott, dressed in civilian clothes, picked up Greeno in an unmarked car and took him to lunch. Elliott asked Greeno several questions about Greeno and Greeno's family. After lunch, Greeno accompanied Elliott in the front seat of Elliott's car to the Fostoria Police Department.[1]
 {¶ 4} Upon arriving at the station Greeno was placed in a small windowless room and was questioned by the officers. Initially Clark stated "So you understand that, right, you are not under arrest or anything, so you're free to go." In response to questioning by the officers regarding the fire, Greeno admitted that he had been at the Doeshire Inn the night of the fire and that he was smoking crack in the second floor bathroom. Greeno further stated that he could have possibly thrown his lighter in the garbage can. Thereafter, Greeno stated to Elliot "I'm just wondering if I'm able to go home today or what" to which Elliott responded "Well, lets talk to Mike you know, I'm going to tell him you're being straight on things, all right?." Greeno then continued to answer questions and further admitted that he could have been using matches to smoke his crack pipe and may have thrown them in the second floor trash can after their use.
 {¶ 5} After making that oral statement, the officers requested that Greeno make a written statement. As Greeno began to write his statement, Clark again told Greeno that he was not under arrest and was still free to go but that he was going to advise Greeno of his Miranda rights anyway. Clark then told Greeno that he had the right to remain silent, that anything he said could and would be used against him in a court of law, that he had the right to talk to a lawyer and have him present when he is being questioned, that if he could not afford to hire a lawyer one would be appointed to represent him and that if he decided to answer questions without a lawyer present, he had the right to stop questioning at any time or stop at any time to talk to a lawyer. Greeno initialed each of these rights on the waiver of rights form separately as each was read aloud to him.
 {¶ 6} Greeno then signed the waiver of rights form which states "I have read this statement of my rights and understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." After signing the waiver, Greeno filled out a written statement. Subsequently, Greeno made several statements to Elliot which indicated that he wanted to leave and Elliot responded each time that that decision had to be made by Clark. Greeno was later placed under arrest for starting the fire at the Doeshire Inn.
 {¶ 7} On September 5, 2002, Greeno was indicted on two counts of involuntary manslaughter, felonies of the third degree, pursuant to R.C.2903.04(B), one count of inducing panic, a felony of the fourth degree, pursuant to R.C. 2917.31(A)(3), (C)(3), one count of possession of crack cocaine, a felony of the fifth degree, pursuant to R.C. 2951.11(A), (C)(4)(a), and criminal damaging, a misdemeanor of the first degree, pursuant to R.C. 2909.06(A)(2).
 {¶ 8} Following an initial plea of not guilty, Greeno filed a motion to suppress the video taped statements of July 10, 2002 and subsequent statements made by Greeno on July11, 2002 and July 18, 2002 claiming that the questioning of Greeno on July 10, 2002 by the officers violated Miranda v. Arizona (1966), 384 U.S. 436 and that everything thereafter should be suppressed. A suppression hearing was held and on November 25, 2002, the trial court denied Greeno's motion to suppress, calling into doubt Greeno's credibility and stating that Greeno was given numerous opportunities to leave the police station, that he had previously been through the legal system, that he was college-educated for one year and that he waived his rights in writing.
 {¶ 9} On November, 25, 2002, Greeno changed his plea from not guilty to no contest with a consent to a finding of guilty on all five counts. The trial court sentenced Greeno to a total of nine years in prison but stayed the sentence pending appeal. Greeno now appeals asserting three assignments of error.
 First Assignment of Error
In an abuse of its discretion, the trial court reversibly erred in denyng defendant-appellant's motions to suppress, for [sic] reason that the police detective interrogator stated in the affirmative, to wit, "yeah," when defendant-appellant asked if he "had to" provide a self-incriminating statement, thereby rendering and so tainting any and all self-incriminating statements and derivative utterances to police officers, by defendant-appellant, as involuntarily obtained under the totality of the circumstances, with the state failing to meets its preponderant burden to prove otherwise, thus violating the fifth andfourteenth amendments to the United States Constitution.
 Second Assignment of Error
In an abuse of its discretion, the trial court reversibly erred in denying the Defendant-appellant's motions to suppress, for reason that the initial and primary police interrogator denied his own authority to grant the defendant-appellant's repeated requests for permission to leave the interrogation and to exit the police station's closed-door interrogation room, thereby violating the defendant-appellant's fundamental rights against self-incrimination, right to remain silent, right to assistance of counsel, and right to due process of law, as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution.
 Third Assignment of Error
In an abuse of its discretion, the trial court reversibly erred in denying the defendant-Appellant's motions to suppress, for reason that the prosecution did not meet its preponderant burden of proving a knowing, voluntary and intelligent waiver of fundamental Miranda rights guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution, as the police interrogators purposefully gave a wrongful and erroneous definition of the word "waiver" to the defendant-appellant, in order for the police to obtain said "waiver" from the defendant-appellant, thereby rendering the obtained "waiver" from the defendant-appellant, by its very definition, as wrongfully so arrested by the police and unintelligibly subscribed by the defendant-appellant.
 {¶ 10} At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. See, e.g., Statev. Carter (1995), 72 Ohio St.3d 545, 552. A reviewing court must accept a trial court's factual findings if they are supported by competent, credible evidence and then independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. State v. Guysinger (1993), 86 Ohio App.3d 592,594.
 {¶ 11} Greeno argues that he was subjected to a custodial interrogation without being advised of his Miranda rights and that under the totality of the circumstances, his statements to the officers were involuntary. Specifically, Greeno claims that he was told that he "had to" write out a self-incriminating statement, that he was made promises that Elliott would help him if he confessed, that Elliott and Clark lied to him, and that he was not allowed to leave the interrogation room.
 Custody {¶ 12} First, Greeno argues that he was subject to custodial interrogation from the moment he arrived at the Fostoria Police Department and therefore the officers were required to read him his Miranda rights before they began questioning him. We disagree. There is no requirement that a peace officer take someone into custody as a prerequisite to interrogating him. On the contrary, only a custodial interrogation triggers the need for a Miranda warning. State v. Mason
(1998), 82 Ohio St.3d 144, 153; Oregon v. Mathiason (1977), 429 U.S. 492,494. It is the coercive nature of custodial interrogation that necessitates the Miranda warnings, thus the warnings are not necessary in nonthreatening, nonconfining circumstances.
 {¶ 13} The Miranda court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda at 444. "A person is considered in custody for purposes of Miranda when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest." State v. Simpson, Franklin App. No. 01AP-757, 2002-Ohio-3717, at ¶ 33, citing Minnesota v. Murphy (1984), 465 U.S. 420, 434,104 S.Ct. 1136, 79 L.Ed.2d 409. "In judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a `reasonable person would have believed that he was not free to leave.'" State v. Gumm (1995), 73 Ohio St.3d 413, 429, quotingUnited States v. Mendenhall (1980), 446 U.S. 544, 554, 100 S.Ct. 1870,64 L.Ed.2d 497
 {¶ 14} "`[T]he requirement of warnings [is not] to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" State v.Biros (1997), 78 Ohio St.3d 426, 440, 678 N.E.2d 891, quoting Oregon v.Mathiason (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714. "The issue is whether an objectively reasonable person in the defendant's position would have understood that he was in custody, and was likely to remain in custody for more than a short period of time[.]" State v.McCrary, Montgomery App. No. 18885, 2002-Ohio-396.
 {¶ 15} In State v. Estepp, the court outlined several factors used to assess how a reasonable person in the defendant's situation would have understood the situation:
1) What was the location where the questioning took place — i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station;
2) Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);
3) Was the defendant's freedom to leave restricted in any way;
4) Was the defendant handcuffed or told he was under arrest;
5) Were threats were made during the interrogation;
6) Was the defendant physically intimidated during the interrogation;
7) Did the police verbally dominate the interrogation;
8) What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning;
9) Were neutral parties present at any point during the questioning;
10) Did police take any action to overpower, trick, or coerce the defendant into making a statement?
 {¶ 16} State v. Estepp (Nov. 26, 1997), Montgomery App. No. 16279, 1997 WL 736501.
 {¶ 17} In addition, an officer's statements concerning the nature of the investigation or his beliefs regarding the culpability of the defendant are also a relevant factor in assessing whether the defendant was in custody when they would have affected how a reasonable person in the defendant's position would perceive his freedom to leave. Stanburyv. California (1994), 511 U.S. 318, 324-325, 114 S.Ct. 1526,128 L.Ed.2d 293. The defendant's own statements should also be considered. Whether a defendant who has made statements at a police station implicating himself in a crime is thereafter in custody depends on the surrounding circumstances, particularly the crime confessed to, interrogators' statements, and whether a reasonable person in the defendant's position would have expected to be in custody after admitting facts possibly constituting the offense. State v. Stringham (Mar. 7, 2003), 2 Dist. App. No. 2002-CA-9, 2003-Ohio-1100, ¶ 24; State v. Singleton (Mar. 31, 1999), 2 Dist. App. Nos. 17003 and 17004
 {¶ 18} While we find that Greeno was not in custody from the time he arrived at the Fostoria police Department, applying the aforementioned factors, we conclude that Greeno was in custody at the time he first inquired whether he was going to be able to go home that day and received an equivocal response from the officers. Greeno was picked up by Elliott and brought to the Fostoria Police Department where he was interviewed in a windowless room without the presence of neutral parties. The substance of the interview reflects that he was considered a suspect at the time the interview began: within five minutes, Greeno is told that he was caught on surveillance cameras leaving minutes before the fire, that his fingerprints have been found in the laundry room, and that they just pulled a lighter out of the trash can. In addition, the officers verbally dominated the interrogation, making repeated statements concerning the nature of the investigation and Greeno's culpability, e.g., "there's enough against you right now," "there's no doubt in my mind * * * it's all going to point to one person and that person is you," "it's all stacked against you from all sides," "all evidence points towards you," "there is no chance," "they are going to nail you," "I'm telling you you're done," "you're going to be dead in the water." These statements were contemporaneous to threats concerning the severity of charges he was facing, promises of assistance, and admonitions to tell the truth and consider what the jury and judge would think. To "coax" the admissions, officers continually confronted Greeno with falsified evidence and frequent appeals to his sense of manhood, deceased father, and religious convictions.
 {¶ 19} Having made statements possibly implicating himself in the fire, Greeno asked what charges were likely. Greeno's inquiry is indicative of the effect the interrogation had upon his psyche and reflects that he was conscious that he was probably not at liberty to terminate the interrogation and leave. Considering the totality of the circumstances, a reasonable person in Greeno's position could have expected to be in custody after admitting facts possibly constituting the offense and being told what the offense would be. In any event, the interview became custodial when officer Elliot told Greeno that he would have to confer with officer Clark as to whether Greeno could go home that day. Consequently, any statements made by Greeno while he was in custody but before the admonition of his Miranda rights are inadmissible. However, the consideration of these statements by the trial court does not necessarily result in reversible error.
 Fruits of the Poisonous Tree {¶ 20} After his Miranda rights were administered, Greeno repeated the statements which he made before Miranda rights were given. Consequently, the next inquiry is whether the admissions made after Greeno was Mirandized must also be suppressed. In Oregon v. Elstad, the United States Supreme Court considered "whether the Self Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." Oregon v. Elstad (1985), 470 U.S. 298. InElstad, the defendant was charged with first-degree burglary. He moved to suppress both his oral and written statements. He argued that his initial unwarned oral statement "let the cat out of the bag" and tainted his written confession as "fruit of the poisonous tree" of the Miranda
violation. The United States Supreme Court disagreed, holding that "* * * a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. In such circumstances, a suspect's second Mirandized statement will be admitted into evidence if the suspect's waiver is deemed voluntary. However, where deliberately coercive or improper tactics were employed in obtaining an initial statement, the fact that a suspect has made an unwarned admission will warrant a presumption of compulsion and all remaining statements must be excluded.
 {¶ 21} In determining whether a defendant's confession was involuntarily induced, the court should consider the totality of the circumstances. State v. Bays (1999), 87 Ohio St.3d 15, 22. Circumstances to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. Id. Moreover, the Supreme Court of Ohio in State v. Cooey (1989), 46 Ohio St.3d 20, 28, has determined that "[t]he use of an `inherently coercive tactic' during interrogation is a prerequisite to a finding of involuntariness. Such tactics include, e.g.,
physical abuse, threats, or deprivation of food, medical treatment, or sleep." "[T]he question of voluntariness is a question of law. Consequently, an appellate court must arrive at its own conclusion as to whether a given confession was voluntary by reviewing the facts of the case." State v. Weeks (Sept. 18, 2000) Logan App. No. 8-2000-07,2000-Ohio-1928, quoting, State v. Jett (Mar. 31, 1998), Portage App. No. 97-P-0023.
 {¶ 22} Greeno argues that he made several involuntary statements regarding the Doeshire Inn fire in response to lies and promises made to Greeno by the officers. Greeno asserts that Elliott promised him that he would help him if he told the truth. Furthermore, Greeno states that Elliott erroneously told him that Greeno was filmed by a surveillance camera at the Doeshire Inn and that a lighter with a fingerprint was found. While we discourage the use of deceit as an interrogation tactic, we cannot find that these statements represent "inherently coercive tactics" which would render Greeno's statements involuntary considering Greeno has experience in the criminal system and there is no evidence of any physical abuse, threats, or deprivation of food, medical treatment, or sleep as contemplated by Cooey, supra. Consequently, we cannot find that that Clark and Elliot's interrogation tactics were so improper or coercive as to warrant a presumption of compulsion and involuntariness which would invalidate any statements made by him after he was admonished of his Miranda rights. As there were no statements made after Miranda
that were not made before, the trial court's consideration of the unmirandized statements that Greeno made while in custody was harmless.
 Waiver of Miranda {¶ 23} Finally, Greeno argues that while he made statements after he was read his Miranda rights, his waiver was ineffective and therefore those statements should be suppressed. We disagree. The Supreme Court has held that a suspect may effectively waive the rights conveyed in theMiranda warnings only if the waiver is made voluntarily, knowingly and intelligently. State v. Dailey (1990), 53 Ohio St.3d 88, 91, citingMiranda, supra. In this case, Greeno argues that he did not knowingly, intelligently, and voluntarily waive his Miranda rights as a result of several misstatements made by Elliott and Clark during their explanation of waiver. While we are aware that in this case, Elliott and Clark made a rather lengthy and unorganized attempt to explain the concept of waiver, Elliott finally clarified the meaning of waiver before Greeno wrote his statement stating,
You have read the statement of rights and understand what my rights are and I'm willing to make a statement and answer questions, which you're willing to do, and you don't want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me (unintelligible) that's your waiver of rights, so that's consistent with what we're talking about so if you're good with that go ahead and sign it right there and give a statement about what happened, and, you know, you're not at any time stop [sic] and, you know, we'll talk about things. You got that right to stop all right?
 {¶ 24} Furthermore, the videotape of the interrogation reflects that Greeno later stated "waiving my rights means that I'm not worried about a lawyer being present or making a statement."[2] Finally, Greeno, who has at least a high school education[3] and had intelligently waived his rights in a previous case, signed the waiver form which is detailed above demonstrating that Greeno understood the effects of waiving his rights. Consequently, we find that Greeno knowingly, voluntarily and intelligently waived his Miranda rights.
 {¶ 25} Based on the foregoing, Greeno's first, second and third assignments of error are overruled and the judgment of the trial court is affirmed.
Judgment affirmed.
WALTERS and CUPP, JJ., concur.
[1] While Greeno asserts that Elliott told him that he had to come down to the station and fill out a statement regarding the fire and then he would be free to leave, Elliott testified that he merely asked Greeno to accompany him to the station to discuss the fire and that Greeno agreed.
[2] While this statement differs slightly from the transcribed version of the statement made by Greeno, the videotape, which was admitted into evidence, reflects the above statement.
[3] The trial court noted on the record that Greeno had one year of college which was divulged at Greeno's bond hearing.