[Cite as *State v. Tussing*, 2011-Ohio-1727.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                 CASE NO. 8-10-11

     v.

KEITH E. TUSSING,                       O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR09-10-0190

**Judgment Affirmed**

Date of Decision: April 11, 2011

APPEARANCES:

    *Marc S. Triplett* **for Appellant**

    *Gerald L. Heaton and Eric C. Stewart* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Keith E. Tussing ("Tussing"), appeals the June 14, 2010 judgment of conviction and sentence of the Logan County Court of Common Pleas, assigning as error the trial court's decision to overrule his motion to suppress.

{¶2} This case stems from allegations made by a fourteen-year-old girl that an adult family member, Tussing, raped her on several occasions. On October 4, 2009, the allegations were reported to law enforcement by the girl's parents. On the same night, Tussing voluntarily arrived at the Sheriff's Office to answer questions and give a statement regarding the allegations. There, he was interviewed by Detective Brugler of the Logan County Sheriff's Office. At that time, Tussing denied having any sexual contact with the alleged victim, consensual or nonconsensual, and agreed to submit to a polygraph examination, which was scheduled a few days later. On October 6, 2009, Tussing arrived at the designated location to take the polygraph examination. The test was administered by Rob Beightler ("Beightler"), a Logan County Juvenile probation officer.

{¶3} After completing the exam, Beightler conducted a post-polygraph interview, during which Tussing admitted to having consensual sex with the victim on one occasion. Following Tussing's interview with Beightler, Tussing was interviewed for a second time by Detective Brugler of the Logan County Sheriff's Office. In this interview, Tussing again admitted to having consensual sex with the victim on one occasion and divulged further details of the encounter. At the end of the interview, Tussing was placed under

arrest and taken into custody. Both of the interviews with Tussing on October 6, 2009, were recorded.

**{¶4}** On November 10, 2009, a Logan County Grand Jury indicted Tussing on one count of unlawful sexual conduct with a minor, in violation of R.C. 2907.04(A), a felony of the third degree due to the fact that Tussing was more than ten years older than the victim. Tussing was thirty-years-old at the time of incident.

**{¶5}** On March 22, 2010, Tussing filed a motion to suppress the recorded self-incriminating statements he made to Beightler and Detective Brugler on October 6, 2009. In his motion, Tussing argued that his statements confessing to having sexual intercourse with the victim should be suppressed because "they were made involuntarily under unfairly coercive interrogative circumstances." (Mot. to Supp. Mar. 10, 2010).

**{¶6}** On April 22, 2010, the trial court held a hearing on Tussing's motion to suppress. Both Beightler and Detective Brugler testified. In addition, the audio recordings of the interviews conducted on October 6, 2009, were submitted to the trial court as evidence and were also transcribed into the record.

**{¶7}** On April 23, 2010, the trial court overruled Tussing's motion to suppress finding his confessions to Beightler and Detective Brugler were not the result of a custodial interrogation and were voluntarily made.

**{¶8}** On May 13, 2010, Tussing withdrew his plea of guilty and entered a plea of no contest to one count of unlawful sexual conduct with a minor, in violation of R.C. 2907.04(A). The trial court accepted Tussing's plea of no contest and found him guilty.

-3-

On June 4, 2010, the trial court sentenced Tussing to three years in prison and classified him as a Tier II sexual offender.

{¶9} Tussing now appeals, asserting the following assignment of error.

**ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS.**

{¶10} In his sole assignment of error, Tussing argues that the trial court erred in denying his motion to suppress his confessions to the polygraph examiner, Rob Beightler, and Detective Brugler. Specifically, Tussing maintains that Beightler improperly induced him to make the self-incriminating statements by suggesting that if he admitted to having consensual sex with the victim, he would receive counseling and probation instead of prison. Tussing contends that this inducement rendered his statements involuntary and not admissible as evidence against him. Tussing further argues that the subsequent interview with Detective Brugler should have been excluded because the coercion inducing his initial confession to Beightler had not "sufficiently dissipated" prior to the second confession to Detective Brugler.

{¶11} We note that an appellate court's review of a decision on a motion to suppress evidence involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. See *State v. Carter* (1995), 72 Ohio St.3d 545,

552, 651 N.E.2d 965. When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside*, 2003-Ohio-5372, at ¶8. With respect to the trial court's conclusions of law, however, our standard of review is de novo and we must decide whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539.

{¶12} At the April 22, 2010 hearing on Tussing's motion to suppress, the prosecution presented the testimony of three witnesses, Sergeant Sines, Rob Beightler, and Detective Brugler, and adduced a number of exhibits, which included the recording of Tussing's interviews with Beightler and Detective Brugler. Tussing did not testify, call any witness, or adduce any exhibits at the hearing.

{¶13} The evidence from the suppression hearing established that on October 4, 2009, Sergeant Sines, a Logan County Deputy Sheriff, received a dispatch regarding a teenaged girl, who claimed that she had been raped. The accused perpetrator was Tussing, who lived with victim and her family at the time. Sergeant Sines located Tussing at the victim's residence and asked him if he would be willing to travel to the Sheriff's Office to answer a few questions. Sergeant Sines explained to Tussing that he was not under arrest and would be going to the Sheriff's Office voluntarily. Tussing indicated to Sergeant Sines that he understood and agreed to go with him. Sergeant Sines transported Tussing to the Sheriff's Office. There was no evidence that Tussing had been placed under arrested or taken into custody.

{¶14} Once at the Sheriff's Office, Deputy Sines read a waiver of *Miranda* rights form to Tussing and asked if he understood the form. Tussing indicated that he understood, initialed several paragraphs, and signed the waiver of rights form. Detective Brugler interviewed Tussing later that night, after he had spoken to victim and her family. During this initial interview, Tussing denied having any sexual relations with the victim, consensual or nonconsenual. However, he did agree to submit to a polygraph examination and indicated that he would call to schedule the test once he verified his work schedule. At the conclusion of the interview, Sergeant Sines drove Tussing back to the victim's home. The victim's family had already packed-up Tussing's belongings and placed them in his truck. Deputy Sines observed Tussing get into his truck and leave the residence.

{¶15} Tussing subsequently called Detective Brugler and arranged to take the polygraph examination on October 6, 2009, at 4:00 p.m. Tussing drove to the Juvenile Detention Center where the polygraph examination was scheduled to be conducted. Beightler administered the polygraph examination to Tussing on October 6, 2009. At the suppression hearing, Beightler testified that he had administered approximately 120 to 150 polygraph examinations over the course of his career. Beightler explained that, in addition to administering polygraph examinations for Logan County, he also worked as a probation officer for the Logan County Family Court, Juvenile Division.

{¶16} The polygraph examination was administered in an unlocked room with minimal furnishings, which included a table and chairs and a laptop used to conduct the

test.  Prior to beginning the polygraph examination, Beightler gave Tussing a "Rights Advisement" form, which explained to Tussing that he was suspected of sexual assault and outlined his Constitutional right to remain silent and right to an attorney.  Tussing signed the form acknowledging that he was waiving those rights by choosing to answer the questions asked of him.  (See State's Exhibit 2).  Tussing also signed a "Consent for Polygraph Examination," which stated the following:

> **I, Keith Tussing, * * * have been advised that I have the right to refuse to submit to a Polygraph Examination.  I have been advised of my right to consult with an attorney.  I have been given the opportunity to contact and consult with an attorney, and I have been told that any comments I make in connection with the examination may be used against me in a Court of Law.**
>
> **I wish to state that I am taking the examination of my own free will and that no force, duress or undue influence was exercised by anyone, neither was I given any promise of any reward or consideration of any kind to induce me to submit to this examination with respect to the sexual assault [charge].**

(State's Exhibit 3).

{¶17} Beightler estimated that Tussing's entire polygraph exam lasted an hour-and-a-half to two hours.  After the exam, Beightler conducted a post-polygraph interview with Tussing, which lasted approximately fifteen minutes.  Beightler recorded this interview with Tussing on a handheld recording device that he carried his pocket.

{¶18} The recording reveals that, at the outset, Beightler informed Tussing, "[y]ou might want an attorney.  You had some problems with this test, okay?"  (April 22, 2010 Tr. at 54).  Tussing inquired about the test and Beightler informed him that he failed.

Beightler continued by explaining to Tussing that he had administered a polygraph examination to the victim prior to Tussing's arrival to the facility, and that she no longer claimed that Tussing had raped her, but that they had consensual sex. Beightler proceeded to empathize with Tussing, stating that he understood Tussing was experiencing a series of personal difficulties in his life and that he did not think Tussing was a "bad guy." (Id. at 55). Beightler then explained the following to Tussing:

> **[Beightler]: I've already told you, cases like this, generally what happens, what I like to see happen, especially in your situation is, you know, if—if you take responsibility for what you and I both know you did, then you're not somebody that I want to waste my tax money on going to prison, okay? You're not somebody that I want to see, you know, lose his daughter. You know, I know you love your daughter. You said she is your pride and joy.**
>
> **[Tussing]: She is.**
>
> **[Beightler]: I don't want her taken away from you.**

(Id. at 57).

{¶19} Beightler informed Tussing that the victim passed the polygraph examination with "flying colors." (Id.). Beightler expressed that he believed Tussing had a conscience and actually cared about doing the right thing. Beightler then reasoned with Tussing:

> **[Beightler]: And in this case, you know, what I would fight for you for is that, you know, maybe some probation, counseling. You said you would do counseling, wouldn't you? Those are the kinds of things that I would look for because I want you to be in your daughter's life.**

> **Now, the other side of that, if you want to continue to lie about it is, you know, they could put you up, you know, in front of a grand jury, and you know darn well what a grand jury is made of.**
>
> **[Tussing]: Oh, yeah.**
>
> **[Beightler]: It's doctors, teachers, people that are going to hear her story, okay, hear what she had to say, know she passed the polygraph and all this stuff, and then you're going to be up there and they're going to be looking at you and it's like man, if he—we can understand that in this day and age stuff happens, but if this guy is not even going to take responsibility, that's not good. You know, this guy will probably do it again, you know, and they're going to want to hammer you.**

(Id. at 58).

{¶20} Shortly after this exchange, Tussing confessed to having consensual sex with the victim on one occasion, but did not divulge the details of the incident. Beightler explained the following to Tussing:

> **[Beightler]: You know, again, I've heard her story. You're—you're starting to match up here, which is good.**
>
> **[Tussing]: All right.**
>
> **[Beightler]: Which gives me that warm feeling that I can go out here and talk to, you know, whoever, you know, and say, look, you know, he's coming clean. He knows he screwed up. You know you screwed up, right? You know that it wasn't right, but at the same time, you know, I'm not going to sit here and judge you because of all of the crap you've been through.**
>
> **[Tussing]: Yeah.**
>
> **[Beightler]: You know, that takes a toll on any person. But I'm not going to stick my neck out for you if you're going to sit here and say—**
>
> **[Tussing]: Oh, I know—**

> **[Beightler]:  —I don't remember, I blacked out or whatever.**
>
> **[Tussing]:  Oh, no, I didn't black out, I just—**
>
> **[Beightler]:  Okay.**
>
> **[Tussing]:  Like I said, I ain't got a great memory.**

(April 22, 2010 Tr. at 60-61).

{¶21} Tussing then disclosed the details of the consensual sexual encounter with the victim to Beightler.  He explained that the incident happened quickly.  The victim pulled down her pants and they engaged in sexual intercourse on the floor of her home.  Tussing recalled the episode barely lasted a minute before they realized that what they were doing was wrong and the sex ended.  The interview was completed shortly after Tussing disclosed these details.  Beightler left the room and brought Detective Brugler into the polygraph room to begin his interview with Tussing.

{¶22} Prior to addressing Tussing contentions that Beightler's statements during the post-polygraph interview improperly induced him into make self-incriminating statements, we acknowledge that Tussing's case is similar to another Logan County case recently before this Court, *State v. Wheatley*, 3rd Dist. No. 8-10-06.[1]  In *Wheatley*, we upheld the trial court's decision to suppress the self-incriminating statements Wheatley made to polygraph examiner Rob Beightler during the post-polygraph interview.  We

---

[1] We note that *State v. Wheatley*, decided on December 13, 2010, having been placed on the accelerated calendar has no authoritative weight.  However, in light of the fact that the *Wheatley* case involves similar facts and some of the same parties and the fact that both cases were discussed by the trial court in rending its decision, we find it particularly relevant to our discussion of the case sub judice.

concluded in that case that Beightler improperly induced Wheatley into confessing that he had raped a child under the age of ten by making unqualified promises of leniency to Wheatley, which were also misstatements of the law. *Id.* at 19. We found particularly egregious Beightler's suggestion to Wheatley that he could avoid prison time and receive counseling by confessing to the offense, when the record indicated that Beightler was aware that Wheatley would face a mandatory jail sentence if he was charged with raping a child under the age of ten. *Id.* at 3. It was also apparent from the record that Wheatley had relied upon Beightler's representations that he would receive counseling, and not prison when he decided to confess.

{¶23} Accordingly, we affirmed the trial court's decision in *Wheatley* that Beightler's statements constituted coercive police interrogation tactics. We further concluded that because the second interview with the detective occurred in close temporal and physical proximity to the post-polygraph interview, the subsequent interview was tainted by the first invalid confession to Beightler and should also be excluded.

{¶24} Initially, the facts in *Wheatley* appear closely comparable to the facts in the case at hand. Wheatley was contacted by the Bellefontaine City Police regarding allegations that he sexually molested one of his family members, who was under the age of ten when the alleged incidents occurred. *Wheatley*, 3rd Dist. No. 8-10-06 at 1. Wheatley agreed to submit to a polygraph examination; however when it came to take the test, law enforcement was unable to locate him. (Wheatley Jun. 10, 2010 JE at 2). On

November 12, 2009, Detective Borba of the Bellefontaine Police Department located Wheatley at a residence in neighboring Union County. (Id.). Wheatley voluntarily agreed to be transported by Detective Borba to the location where the polygraph test was to be administered. (Id.). Wheatley rode in the front seat of Detective Borba's unmarked vehicle and was not handcuffed nor placed under arrest. (Id.).

{¶25} Wheatley's polygraph examination was held in the same room at the Juvenile Detention Center as Tussing's and, as noted above, the test was also administered by Rob Beightler. (Wheatley Jun. 10, 2010 JE at 2). Wheatley signed the same rights advisement and consent forms as Tussing did prior to taking the test. (Id.). At the conclusion of Wheatley's polygraph examination, Beightler conducted a post-polygraph interview. (Id.).

{¶26} As we noted in the *Wheatley* opinion, Beightler began the post-polygraph interview by informing Wheatley that the test indicated he had significant reactions to questions about the victim "[s]pecifically the one at the—end where it asked if you had touched her bare vagina with your bare penis." (Wheatley Supp. Tr. at 37). Beightler then told Wheatley "[t]his is something that happened so long ago, you know that it's—it's kind of like—it's not something that's, you know, exactly pressing on our minds, but at the same time we need to know the truth." (Id. at 38). Beightler went on to state "[n]ow, do I think that you are some cold-blooded person that, you know, needs to be in prison or anything like that? No, I don't think you do." (Id.). Beightler then told Wheatley that he thought Wheatley was not the type of person that would do something

like this again, especially given the fact that Wheatley now had his own child. (Id.). In addition, Beightler mentioned that Wheatley had been young and had made a stupid decision, but that because of his age his brain had not yet fully developed and that his hormones had started kicking in. (Wheatley Supp. Tr. at 38-39).

{¶27} However, at this point the similarities between the *Tussing* and *Wheatley* cases begin to diverge significantly. Beightler specifically told Wheatley that he would recommend counseling given the fact that Wheatley had been young, had made a stupid decision, and was not likely to repeat something like this again, that he was not "somebody that we need to be concerned with in that regard." *Wheatley then specifically asked Beightler, "am I going to jail?" to which Beightler responded by saying, "That's on you. I mean, that depends on what you want to do, okay?"* (Wheatley Supp. Tr. at 40). *Wheatley was then told that if he was truthful he would be the type of person that would get a second chance.* (Id. at 42). In particular, Beightler said, "if they're interested in getting counseling, if they're honest and open about what happened, that's the type of person you're willing to work with." (Id.). Again, Beightler repeated that the people who get counseling and make sure it does not happen again are not the type of people that they want to "string [] up on the courthouse lawn or anything like that." (Id. at 42-43).

{¶28} As we noted in our opinion in *Wheatley, Beightler then proceeded to inform Wheatley that he was not a law enforcement officer* and continued the interview by further stating:

[Beightler]: You know, I told you you're not a good liar. That's a good thing. You've got a conscience. But at the same time, that's why I need you to be up front with me. You know, obviously being afraid of jail, I – I can understand that, but here's the thing that I'm trying to prevent for you, okay? Jail's not the big deal. I don't want you to go to prison. All right? I don't want that to happen. And, you know, I know you've got a kid. That's what you need to think about, is being there for your kid. Okay? * * * if you're willing to talk about it and show that you're not holding secrets, that you're being up front, which shows I – I want to make sure it doesn't happen again. I'm going to tell you everything. I'm going to be open about it. I'm not keeping secrets. Here it is. This is what happened. It was a mistake. I know it was a mistake. It's not going to happen again. I'll do whatever it takes to make sure it doesn't happen again. *And those are the people, you know, that – that get to spend time with their kids and get to watch their kids grow old, you know, and not –*

[Wheatley]: *And get to go home.*

[Beightler]: *Yeah. And not have to do that in prison.*

* * *

[Wheatley]: I just don't want to get locked up.

[Beightler]: I understand that. But what you need to think about is your daughter, okay? I don't want to see you go to prison and not be able to be with your daughter, and I'm trying to help you as much as I can * * *."

(Wheatley Supp. Tr. at 46-47) (Emphasis added).

{¶29} Wheatley then admitted that he had sex several times with the child victim, the last time shortly after he had turned eighteen years of age in October of 2007. (Id. at 48-51). The interview then concluded with the following exchange:

[Beightler]: Okay. So how do you feel about what you did? Am I right? I mean, do you feel sorry about it?

[Wheatley]: I want to get something to help me.

-14-

[Beightler]: Sure. That's what we want to do. So you will be willing to participate –

[Wheatley]: I will. I'm willing to do the counseling or whatever.

[Beightler]: Okay. They've got great counselors in this area, you know, so –

* * *

[Wheatley]: Can I get names and numbers?

[Beightler]: Yeah, sure. I'll make sure you get that. But they're – I mean, they're really pretty laid back guys that have been through it all before, and, you know, they'll see in you what I see in you; that you're a pretty decent guy.

[Wheatley]: Even if at all possible I could start it tomorrow.

[Beightler]: Okay. Well, they sometimes have a waiting list, but –

[Wheatley]: Yeah, that's fine.

[Beightler]: But, yeah. Okay.

[Wheatley]: *I want to do anything to keep myself out of jail * * * Be there for my little girl.*

(Wheatley Supp. Tr. at 51-52) (Emphasis added).

{¶30} Shortly after Beightler's post-polygraph interview, Detective Borba began his interview with Wheatley, in which he gave a more detailed description of his sexual encounters with the child. (Wheatley Supp. Tr. at 13-16).

{¶31} We note that the trial court also recognized the significant distinctions between the *Tussing* and *Wheatley* cases in its judgment entry granting Wheatley's

motion to suppress.[2]   We concur with the trial court's analysis in this regard.   In particular, it is apparent from the trial court's analysis of the issues, that the trial court regarded Beightler to be an agent of the state in his capacity as a polygraph examiner because he was acting at the behest of a law enforcement officer to gather evidence of a suspected crime.[3]   We concur with this conclusion in the case before us.   Accordingly, we decline to entertain the prosecution's arguments that Beightler was "non-law enforcement" personnel and, therefore, not required to observe the same duties in conducting his interview of Tussing as a law enforcement officer.   We also concur with the trial court's conclusion that neither the *Wheatley* nor the *Tussing* case involved a custodial interrogation.

**{¶32}** Notwithstanding these conclusions, the Due Process Clause requires an inquiry regarding the voluntariness of a defendant's confession, which is a separate inquiry from the considerations regarding whether a defendant is subject to a custodial interrogation.   *State v. Petitjean* (2000), 140 Ohio App.3d 517, 526, 748 N.E.2d 133,

---

[2] For clarification purposes, we note that Tussing's polygraph examination with Beightler occurred on October 6, 2009, and Wheatley's polygraph examination took place a month later on November 12, 2009.   Tussing's suppression hearing occurred on April 22, 2010, one month prior to Wheatley's suppression hearing which was held on May 27, 2010.   The trial court granted Wheatley's motion to suppress on June 2, 2010 and the prosecution subsequently filed an appeal to this Court pursuant to Crim.R. 12(K).   After the trial court overruled Tussing's motion to suppress, he pled no contest and was sentenced on June 14, 2010.   Accordingly, even though Wheatley's case occurred subsequent to Tussing's, Wheatley's appeal was heard first by this Court.

[3] See e.g *Evans,* 144 Ohio App.3d at 553-54 (holding that just because the counselors were not law enforcement officials pursuant to R.C. 2901.01(A)(11)(b), they still could have been agents of law enforcement officials and as such would have had a duty to give the Miranda warnings to defendant).   See, also, *State v. Coonrod*, 12th Dist. No. CA2009-08-013, 2010-Ohio-1102, ¶¶8-13 (stating that Miranda requirements do not apply when admissions are made to persons who are not "officers of the law or their agents"); *State v. Gradisher*, 9th Dist. No. 24716, 2009-Ohio-6433, ¶7, citing *State v. Watson* (1971), 28 Ohio St.2d 15, 26, 275 N.E.2d 153; *State v. Thoman*, 10th Dist. No. 04AP-787, 2005-Ohio-898, ¶11 (recognizing that a social worker could be required to give Miranda warnings, i.e., if they were acting as agents of the police department); *State v. Jones,* 8th Dist. No. 83481, 2004-Ohio-5205, ¶40.

citing *Dickerson v. United States* (2000), 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405. Generally, once the admissibility of a confession has been challenged by way of a motion to suppress, the State has the burden to prove by a preponderance of the evidence that the statement was given voluntarily. *Lego v. Twomey* (1972), 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618; *State v. Melchior* (1978), 56 Ohio St.2d 15, 25, 381 N.E.2d 195.

**{¶33}** "In determining whether a defendant's confession was involuntarily induced, the court should consider the totality of the circumstances." *State v. Estep*, 3rd Dist. No. 13-07-14, 2007-Ohio-6554, ¶21, citing *State v. Bays* (1999), 87 Ohio St.3d 15, 22, 716 N.E.2d 1126. The circumstances to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *Id*., citing *Bays*, 87 Ohio St.3d at 22.

**{¶34}** In addition, an appellate court must determine whether the totality of the circumstances surrounding the confession indicates that a defendant's "will was overborne and his capacity for self determination was critically impaired because of coercive police conduct." *State v. Hazlett*, 3d Dist. No. 8-06-04, 2006-Ohio-6927, ¶13, citing, *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711. Furthermore, "the question of voluntariness is a question of law. Consequently, an appellate court must arrive at its own conclusion as to whether a given confession was voluntary by reviewing

the facts of the case." *Greeno*, 2003-Ohio-3687, at ¶21, citing *Weeks*, 3d Dist. No. 8-2000-07, at *2, quoting *State v. Jett* (Mar. 31, 1998), 11th Dist. No. 97-P-0023.

{¶35} We note that in the case before us there was no evidence of physical deprivation or mistreatment. Moreover, both interviews occurred just once and did not appear to be excessively long. However, upon reviewing other factors relative to the totality of the circumstances analysis, we believe there are significant differences in the case before us regarding the voluntariness of the suspects' statements which lead us to a different conclusion from the one reached in the *Wheatley* case.

{¶36} As we noted in our prior opinion, Wheatley was twenty-one-years-old at the time he submitted to the polygraph examination with Beightler. Wheatley had only completed a sixth grade level of education and testified that he could not read well, but understood English. (Wheatley Jun. 10, 2010 JE at 5). Wheatley also had no prior experience with police interviews or interrogation.

{¶37} On the other hand, Tussing was thirty-years-old at the time he took the polygraph examination, had completed high school and was of average intelligence. Tussing also admitted to serving time in prison on a prior felony conviction. There was also evidence that Tussing had prior experience with police interrogation. Specifically, in his October 6, 2009 interview with Detective Brugler, Tussing stated the following regarding his prior felony offense, "Like I said, I did prison time. I learned from my mistakes. But I also wish, you know, when they threaten me with the polygraph and tell them let's take one, I probably wouldn't have had the charges I've got." (Tussing Apr.

22, 2010 Tr. at 94).  Moreover, as Detective Brugler placed the handcuffs on Tussing after he confessed to having consensual sex with the victim, Detective Brugler stated, "You've done this before, haven't you?"  Tussing replied, "Yeah."  Detective Brugler further inquired, "Those all right on you?  Does that feel all right?"  Tussing responded, "Yeah.  Old memories."  (Tussing Apr. 22, 2010 Tr. at 107).

{¶38} Furthermore, in reviewing the trial court's comparison of the *Wheatley* and *Tussing* cases in its judgment entry suppressing Wheatley's confession, we note that the trial court highlighted another significant distinction in the cases on the issue of voluntariness.  Specifically, the trial court made the following observation regarding the specific statements Beightler made to both *Wheatley* and *Tussing*.

> **Mr. Tussing was charged with unlawful sexual conduct with a minor, a felony of the third degree and Beightler's statement about probation and counseling were colorable *[sic]* true in Tussing's case.  In this case [Wheatley] is charged with rape with an allegation that the victim was less than ten years of age. * * * The Court concludes that not only is a prison sentence mandatory [for this offense] but in these situations life imprisonment is required and life imprisonment without parole is an option.  This is a far cry from the representations made to [Wheatley] during the interview and it distinguishes these facts from the facts in Tussing * * *.**

(Wheatley Jun. 10, 2010 JE at 6-7).

{¶39} As noted earlier, the trial court's observations are confirmed in our own analysis.  When Wheatley agreed to take the polygraph exam, he was suspected of repeatedly raping a child under the age of ten.  There was evidence in the Wheatley record of Beightler's awareness that if Wheatley was charged with rape of a child under

the age of ten, he would be facing a mandatory prison term. Nevertheless, Beightler continued to make specific representations to Wheatley that if he confessed, *he would receive counseling and would not go to jail*—a clear misstatement of the law. See *State v. Arrington* (1984), 14 Ohio App.3d. 111, syllabus, 470 N.E.2d 2111. (holding where an accused's decision to speak was motivated by a police officer's (or state agent's) statements constituting direct or indirect promises of leniency or benefit and other representations regarding the possibility of probation which were misstatements of the law, his incriminating statements, not being freely self-determined, were improperly induced, involuntary and inadmissible as a matter of law).

{¶40} Moreover, it is evident Wheatley relied on Beightler's representations that if he confessed, he would not receive prison time. Wheatley's desperation to avoid jail is apparent in the record. Wheatley specifically told Beightler that he wanted to "get something to help me * * * [and] [e]ven if at all possible I could start it tomorrow," because as he told Beightler, "*I want to do anything to keep myself out of jail * * * Be there for my little girl.*" (Wheatley Tr. at 51-52) (emphasis added). In addition, Wheatley testified at the suppression hearing that based on his conversation with Beightler he believed that if he did not confess then he "would go to prison;" however, if he did confess "[t]hat he would keep it to where I would not go to prison and I would be out with my daughter." (Id. at 66).

{¶41} However, these unequivocal misrepresentations of what would happen to Wheatley were not present in Tussing's interview with Beightler. Rather, as discussed

-20-

above, Tussing was of average intelligence and far more familiar with police interviewing tactics. Moreover, being suspected of unlawful sexual conduct with a minor, Tussing was not facing a mandatory prison term and, as the trial court noted, Beightler's statement mentioning probation and counseling were "colorably true."

{¶42} More importantly however, all of Beightler's statements to Tussing about probation and counseling involved suggestions that Beightler would make a *personal recommendation of leniency* as opposed to repeated and specific representations to Wheatley that *leniency would be granted.* Thus, for example, Beightler stated to Tussing, "*what I like to see happen*, especially in your situation is, you know, if—if you take responsibility for what you and I both know you did, then you're not *somebody that I want to waste my tax money on going to prison.* (Tussing, Tr. p. 58). "And in this case, you know, *what I would fight for you for* is that, you know, maybe some probation, counseling." (Id. p. 58). Finally, unlike Wheatley, there is no evidence that Tussing actually relied on Beightler's representations in deciding to make the self-incriminating statements to Beightler.

{¶43} In drawing these distinctions, we note that this Court has previously held "[a] suggestion of leniency is not enough to invalidate a confession, but is only one factor to be considered by the court in determining whether the confession was voluntarily made." *State v. Jelks*, 3d Dist. No. 17-08-18, 2008-Ohio-5828, ¶16, citing *State v. Wilson* (1996), 117 Ohio App.3d 290, 294, 690 N.E.2d 574, citing *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895. "'Promises that a defendant's cooperation will be

-21-

considered in disposition of the case, or that a confession will be helpful, do not invalidate an otherwise legal confession.' " *Id.*, quoting *Wilson*, 117 Ohio App.3d at 294, citing *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082, certiorari denied (1995), 514 U.S. 1120, 115 S.Ct. 1983, 131 L.Ed. 871.

{¶44} In sum, we do believe that any mention of specific sentencing terms, such as probation and counseling in lieu of jail time during an interrogation such as Tussing's or Wheatley's, may well raise a presumption of improper or misleading inducement. However, we also believe that these statements must be reviewed within the framework of the totality of the circumstances and be evaluated with other factors that support the voluntary nature of the defendant's self-incriminating statements. In evaluating the case before us, it is our view that Beightler's representations to Tussing that he would personally recommend probation or counseling if he confessed, do not rise to the same level of specific representation that a confession would lead to probation in lieu of jail present in the *Wheatley* case. Finally, we must note in passing that there is no evidence in the record to establish that Beightler's promises to personally recommend leniency were either falsely made at the time or in fact did not happen. Accordingly, in reviewing the totality of the circumstances surrounding Tussing's confession to Beightler, we find that Beightler comments about leniency were not coercive.

{¶45} Aside from Beightler's personal recommendation of leniency, Tussing also argues that Beightler lied to him about the results of the victim's polygraph examination. In the interview, Beightler told Tussing that the victim passed with "flying colors," when,

in fact, Beightler testified at the suppression hearing that she failed the polygraph exam. We note that while deception is a factor that bears on the voluntariness of a defendant's confession, this fact, standing alone, is not dispositive of the issue. See *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97. Rather, the issue remains whether the "confession arises from defendant's will being overborne." *State v. Brown* (Jan. 30, 2001), 7th Dist. No. 96CA56, citing *Schneckloth v. Bustamonte* (1973), 412 U.S. 226. Upon considering all the evidence supporting the voluntariness of Tussing's confession, we find that Beightler's deception regarding the victim's polygraph results was not enough to render his confession involuntarily.

{¶46} Based on the foregoing discussion, we concur with the trial court's conclusion that there are significant distinctions between the *Wheatley* and *Tussing* cases that necessarily result in different outcomes. In this case, there is no evidence that Tussing's will was overborne or that his capacity for self-determination was critically impaired because of Beightler's conduct during the interview. As such, we conclude that Tussing voluntarily made the self-incriminating statements to Beightler. Therefore, we find that the trial court did not err in overruling Tussing motion to suppress.

{¶47} We note that Tussing also argues that the trial court should have suppressed the self-incriminating statements he made to Detective Brugler immediately following his initial confession to Beightler. Tussing does not allege that Detective Brugler made any improper statements which induced his confession. Rather, Tussing's argument on this point solely relies on the presumption that his statements to Beightler were involuntarily

made and that the coercion from the first interview was still present in Brugler's interview of Tussing. Having found that Tussing's confession to Beightler was voluntary and not the result of coercive state conduct, we do not find that his statements to Detective Brugler should be excluded.

{¶48} For all these reasons, Tussing's assignment of error is overruled and the judgment of the Logan County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**