[Cite as *State v. Latham*, **2012-Ohio-2106**.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                        :

    Plaintiff-Appellee                    :            C.A. CASE NO.    24636

v.                                                              :            T.C. NO.    2010 CR 2688

CRYSTAL K. LATHAM                             :            (Criminal appeal from
                                                    Common Pleas Court)

    Defendant-Appellant                 :

                                                            :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the ___11th___ day of ___May___, 2012.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MARK A. DETERS, Atty. Reg. No. 0085094, 371 West First Street, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    This matter is before the Court on the Notice of Appeal of Crystal Kaneshia

Latham, filed May 12, 2011.   On December 29, 2010, Latham was indicted on one count of

theft (beyond the scope of consent) of property having a value of $500.00 or more, in violation of R.C. 2913.02(A)(2), a felony of the fifth degree. The property at issue was bedroom furniture Latham rented from the Rent-A-Center furniture store on Siebenthaler Avenue. Following a bench trial, Latham was found guilty and sentenced to community control sanctions for a period of five years. The parties stipulated to restitution in the amount of $569.76.

{¶ 2} At trial, Jessica Lallemand testified that she is employed at the Rent-A-Center location where Latham rented the furniture. According to Lallemand, Latham was already an existing customer of the store when Lallemand commenced her employment there. Lallemand identified a copy of the application, dated April 9, 2010, that Latham completed and signed to obtain the bedroom furniture. On the application, Latham listed her date of birth, driver's licence number, social security number, her cell phone number, her landlord's number, her employer's name, address and phone number, and the names and phone numbers of four references. Latham further provided the store with a check stub and a copy of a utility bill. Lallemand also identified a copy of the rental agreement that she and Latham signed, which lists the merchandise that Latham rented and the rental amount due each week. Lallemand testified, "It shows that there's weekly payments of $51.75. If you go down further where it says total payments and it says weekly, she would have paid 52 weeks if she decided to take it out to the full length of the agreement and the total amount would have been $2,503.23 * * * ." Lallemand testified that Latham also had the option of paying cash for the furniture within 90 days of delivery for a price of $1,169.74. Latham testified that the agreement provides that Rent-A-Center

has the right to repossess the furniture in the absence of timely payments. Lallemand identified documentation relating to Latham's payment history. According to Lallemand, Latham made two payments for the bedroom furniture, one on April 10, 2010, for $50.58, and one on April 28, 2010, for $57.10. Lallemand stated that the payment made on April 28, 2010 was due on April 24, 2010.

{¶ 3} Lallemand testified that pursuant to "company guidelines," efforts are made to contact delinquent customers for 60 days, and then the furniture is "charged off" of Rent-A-Center's records if it is not returned. Lallemand identified documentation of the store's "call history" to Latham. Attempts at contact were made from April 23, 2010, until June 12, 2010, according to Lallemand. She testified that the records reflect that Latham's phone was disconnected for a period of time. Lallemand stated that Rent-A-Center employees went to Latham's residence to establish contact, and that they left "door hangers" there, indicating that someone had been there in person. Lallemand testified that on May 17, 2010, a certified demand letter was sent to Latham, which was returned unopened. She further testified that messages were left with the references Latham listed on her application. Lallemand stated that no further payments were received after the second payment, and that Latham did not return the furniture. Lallemand testified that Rent-A-Center's original cost for the mattress was $225.00, the original cost of the bedroom furniture was $540.00, and the original cost of the bedframe was $37.00.

{¶ 4} On cross-examination, Lallemand stated that Latham had previously rented a television, refrigerator and stove from Rent-A-Center, and that Latham "returned them and they were delinquent when they were returned." She further stated that Latham had rented

and returned another set of bedroom furniture. Lallemand stated the contract Latham signed does not indicate that criminal prosecution is a consequence of failure to pay.

{¶ 5} On redirect examination, Lallemand stated that in Rent-A-Center's prior dealings with Latham, store employees were able to contact Latham and arrange for the return of the store's merchandise, and that Latham was accordingly not prosecuted. On recross-examination, Lallemand stated that in June, 2010, she contacted the police to initiate prosecution. In response to questions from the court, Lallemand clarified that if a customer returns property after the 60 day period of active collection efforts, after the property has been "charged off" of the store's records, the store will terminate prosecution.

{¶ 6} Steve Moberly testified that he is the collections manager for the Siebenthaler Avenue Rent-A-Center. Moberly stated that he and Lamar Washington delivered the bedroom furniture at issue to Latham's address at 1715 McArthur Avenue, apartment number 14. He identified the delivery checklist that Latham signed. According to Moberly, the checklist indicates that Latham's next payment was due on April 24, 2010. Moberly identified the call history audit for Latham, and he testified that Rent-A-Center employees attempted 45 calls to her, and 11 to 12 calls to her references. Moberly stated that at least eight attempts were made to personally contact Latham at her residence, and he stated that "door hangers" were left there that provided the store's phone number. Moberly testified that all of the attempts at contact were probably not documented, because, "our account managers, some are better than others at keeping records of things. Back when Ms. Latham's account was in I had substandard account managers at best * * * ." Moberly stated that Latham did not contact the store in response, and he testified that the property had

not been returned. On cross-examination, Moberly stated that any contact from Latham after the account is "charged off" would not be documented.

{¶ 7} At the conclusion of the State's case, Latham moved for acquittal, and the court overruled her motion.

{¶ 8} Phyllis Dixon testified that Latham has "been like a daughter or niece to me for about the last five or so years and I'm like her kids' godmother and I'm like her mother." Dixon stated that Latham listed her as a reference on the Rent-A-Center contract. According to Dixon, she received two or three calls a day from the store over a two week period. Dixon stated that during that period Latham went to Alabama because "somebody was sick or something." Dixon testified that Latham was unable to reach her using her own cell phone while she was away because Latham's cell phone did not have a roaming feature. Dixon stated that Latham used someone else's phone to call her, and that she was unable to call Latham directly. Dixon testified she had "access to a key" to Latham's residence, but that Rent-A-Center would not allow her to arrange for the pick up of the furniture in the absence of Latham's personal authorization. On cross-examination, Dixon stated that Latham went to Alabama in May, 2010, and she was gone two or three weeks. Dixon testified that she told Latham that Rent-A-Center employees were trying to reach her.

{¶ 9} Latham testified that she works for Senior Resource Center, Exclusive Home Care, and Exclusive Caregivers as a nursing assistant/home health aide, and that her jobs keep her away from home most of the time. According to Latham, she first rented property from Rent-A-Center in 1999, and she testified that she has continuously done so from that time. She stated that she initially rented from the Siebenthaler location in 2005.

According to Latham, "half the time when I wasn't able to make the payment I always tell them they can come and get it." She stated that she is still in possession of the furniture at issue. Latham stated that she suffers from diabetes, and that she was unable to continue to pay for the furniture because she lost her health insurance and had to pay for her insulin. Latham testified that she phoned Lallemand and Lamar Washington at Rent-A-Center and told them to retrieve the furniture because she could no longer afford it.

{¶ 10} Latham stated that she went to Alabama on May 10, 2010, for the funeral of her great-great grandmother. According to Latham, while she was there, "there was a big heavy storm and we had family members in Columbus, Mississippi, and we was down there, helping them, bringing them back towards Carrolton, Alabama where I'm from."
She stated that she had contact with Dixon and another of her references while she was gone, and that they relayed messages to her from Rent-A-Center. Latham testified that she told Dixon to get a key to Latham's residence from her grandmother in Dayton so that the furniture could be picked up. She stated that she did not have cell phone service in Alabama, and that she used her cousin's cell phone. Latham stated she returned to Dayton on May 29, 2010.

{¶ 11} According to Latham, upon her return, she phoned Moberly and told him "they were more than welcome to come and get their furniture because I was not trying to keep it." Latham stated that Moberly told her that someone would be at her residence at 6:00 p.m. that evening to get the furniture. According to Latham, she replied that she had to work and could not be home before 8:00 p.m. Latham stated that no one came to get the furniture. A month before trial, according to Latham, she ran into Moberly by chance and

asked him why he had not picked up the furniture. She stated that Moberly did not make arrangements to pick up the furniture. According to Latham, the furniture is in good condition, and she does not use it.

{¶ 12} Latham testified that she left town again on June 5, 2010, for four days, to attend the funeral of her cousin. She stated that when she was home between trips she observed "door hangers" on her door and called Rent-A-Center. Latham testified, "Jessica answered the phone and I told her specifically, why y'all keep putting these door tags on my door when I done called up here and asked you several times to come and get the bedroom suite?" Latham testified that she changed her cell phone number on May 8, 2010, because she no longer wanted to receive calls from the father of her children. She stated that she advised Lamar Washington at Rent-A-Center of the change on that date. When asked if she received calls from Rent-A-Center on her new number, Latham responded affirmatively and stated, "They just start blowing me up." Latham stated that she did not receive the certified demand letter from Rent-A-Center.

{¶ 13} On cross-examination, Latham stated that she did not call Rent-A-Center from Alabama because "before I left I already had told Jessica I wasn't going to pay it because I needed my insulin more than I need a bedroom suite, because my insulin was $517."

{¶ 14} In rendering its decision, the court noted from the bench that its "decision is premised upon my assessment of the credibility of the witnesses and that which occurred following Ms. Latham taking the bedroom furniture into her possession."

{¶ 15} Latham asserts three assignments or error. We will consider her first and

second assignments of error together.   They are as follows:

> THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL
>
> THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY, BECAUSE THE EVIDENCE WAS NOT SUFFICIENT.

{¶ 16}   According to Latham, the State failed to show that she "had exerted control over the furniture beyond the scope of the express or implied consent" of Rent-A-Center. She further asserts that had she "moved her residence, the furniture with it, and hidden herself, it could be conceivably inferred that she was attempting a theft of the furniture," but that she did not change her address or conceal her identity, or refuse to return the property. According to Latham, she provided Rent-A-Center with accurate contact information. Latham argues, "there was no evidence supporting an inference that Appellant intended to steal the furniture. * * * [T]he evidence would support the opposite inference.   This case is an all too common example of private parties * * * seeking to address an alleged civil wrong by employing the criminal law."

{¶ 17}   As this Court has previously noted:

> A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence presented at trial. * * * Under Crim.R. 29, a trial court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of

a crime has been proved beyond a reasonable doubt. * * * Furthermore, a trial court must view the evidence in a light most favorable to the State when considering a motion for acquittal. * * *

An appellate court undertakes de novo review of the trial court's decision on a Crim.R. 29(A) motion and will not reverse the trial court's judgment unless reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt. * * *

In a non-jury trial, however, the defendant's plea of not guilty serves as a motion for a judgment of acquittal and obviates the necessity of renewing a Rule 29 motion at the close of all the evidence. *State v. Turner,* 2d Dist. Montgomery No. 18866, 2002-Ohio-54.

{¶ 18} As the Ohio Supreme Court has further previously noted:

In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70.

{¶ 19}   R.C. 2913.02(A)(2) provides: "No person, with purpose to deprive the owner of property * * * , shall knowingly obtain or exert control over * * * the property in any of the following ways: * * * (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent."

{¶ 20}   Knowingly is defined in R.C. 2901.22(B): "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 21}   R.C. 2913.02(B)(10) provides that evidence "of intent to commit theft of rented property * * * shall be determined pursuant to the provisions of section 2913.72 of the Revised Code."   That section provides:

(A) Each of the following shall be considered evidence of an intent to commit theft of rented property * * *

(1) At the time of entering into the rental contract, the rentee presented the renter with identification that was materially false, fictitious, or not current with respect to name, address, place of employment, or other relevant information.

(2) After receiving a notice demanding the return of rented property as provided in division (B) of this section, the rentee neither returned the rented property nor made arrangements acceptable with the renter to return the property.

(B) To establish that a rentee has an intent to commit theft of rented

property * * * under division (A)(2) of this section, a renter may issue a notice to a rentee demanding the return of rented property. The renter shall mail the notice by certified mail, return receipt requested, to the rentee at the address the rentee gave when the rental contract was executed, or to the rentee at the last address the rentee or the rentee's agent furnished in writing to the renter.

(C) A demand for the return of rented property is not a prerequisite for the prosecution of a rentee for theft of rented property * * * . The evidence specified in division (A) of this section does not constitute the only evidence that may be considered as evidence of intent to commit theft of rented property or rental services.

{¶ 22} Viewing the evidence in a light most favorable to the State, we conclude that sufficient evidence exists from which reasonable minds can conclude that each material element of theft (beyond the scope of consent) of property with a value of over $500.00 was proven beyond a reasonable doubt. In *State v. Marshall*, 2d Dist. Montgomery No. 20744, 2005-Ohio-5585, upon which the trial court relied, this Court affirmed Marshall's conviction for theft after a bench trial on facts similar to those herein. Marshall rented a clothes dryer from a Rent-A-Center location in Trotwood, and he made an initial payment covering the first two weeks rental when the dryer was delivered to his home. Marshall then made a payment covering a month's rental, but the payment was seven days late. At that time, he also rented a stereo system, for which he received two weeks free rental as a promotional offer. Marshall later made one rental payment for the stereo, which

was late.  Marshall made no further payments on the dryer or the stereo, and he did not return them or contact the store.  After unsuccessful attempts at collection for over 30 days, Rent-A-Center sent Marshall a collection letter by certified mail demanding  that he either return the items or pay for them.  An employee of the store later advised Marshall by phone that  his account was terminated and that the only option was to return the items.  When Marshall refused, Rent-A-Center commenced a criminal prosecution.  Marshall eventually returned the items.

{¶ 23}  This Court determined "that when Defendant told Rent-A-Center personnel that he would not return their property despite being in default on his rental agreement, this case went from being a civil collection of a debt to criminal theft in violation of R.C. 2913.02(A)(2)."  Id., ¶ 24.  This Court further held that during the period in which Marshall kept the property, without making payments, he "exerted control over that property beyond the scope of consent given by Rent-A-Center, as specified in their contract."  Id., ¶ 26.  The court concluded that Marshall's "intent to deprive the owner, Rent-A-Center, of its property can reasonably be inferred from his retention of the rental property without making any payments for its use and his explicit refusal to return the property to Rent-A-Center. This evidence is sufficient to demonstrate a violation of R.C. 2913.02(A)(2)."  Id.

{¶ 24}  As in *Marshall*, Latham's intent to deprive Rent-A-Center of its property can be inferred from her retention of the furniture without further payment and evidence which establishes she did not return it upon demand.  Previously, in fact, Latham had consistently arranged for the return of items when she was unable to make the payments.  Here, Moberly testified that 45 calls were made to Latham's number, 11 or 12 calls were made to her

references, employees went to her residence at least eight times, leaving "door hangers" for Latham, and Moberly testified that Latham did not respond. Latham admitted that Dixon and another friend listed as a reference relayed messages to her from the store, and she removed the "door hangers" when she returned home. In other words, Latham was on notice pursuant to R.C. 2913.02(B)(10) that Rent-A-Center sought the return of the furniture. This fact is undisputed. While Latham stated that she advised Rent-A-Center employees to retrieve the furniture, the trial court clearly found that she lacked credibility, and as discussed more fully below, we defer to the court's assessment of credibility. Further, Latham's argument that *Marshall* is distinguishable because she, unlike Marshall, did not explicitly refuse to return the furniture, lacks merit. Latham's inaction and ongoing retention of the property without payment despite her knowledge of the store's collection efforts is sufficient evidence of her intent to deprive Rent-A-Center of the furniture. Finally, while Latham argues, from a public policy standpoint, that "[g]reat care should be taken that the criminal law not be employed to attempt to right an alleged civil wrong[1]," the law in our district is clear as set forth in *Marshall*. Since the trial court did not err in overruling Latham's motion for acquittal, and since her conviction is supported by sufficient evidence, Latham's first and second assigned errors are overruled.

{¶ 25} Latham's third assigned error is as follows:

THE TRIAL COURT'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 26} According to Latham, the testimony of Lallemand and Moberly lacks

---

[1]*State v. Howell,* 64 Ohio Misc.2d 23, 29, 639 N.E.2d 531 (Ohio Mun.1994).

credibility. She asserts that she made multiple attempts to return the furniture, and that Dixon also "attempted to negotiate the surrender of the furniture - none of which was documented" by Rent-A-Center. She further asserts that she was out of town for two funerals during the periods of "May 17, 2010 - May 29, 2010; and June 5, 2010 - June 9, 2010. Thus, Appellant was only in town for the collection efforts on May 1 - 16, 2010; May 29 - June 4, 2010, and June 9 - 12, 2010 - a total of 27 days!  And, Appellant was working three different jobs * * *  between the hours of 8:00 a.m. and 8:00 p.m. Monday through Saturday."

**{¶ 27}**    As this Court has previously noted, in a weight of the evidence challenge, an appellate court::

> "[R]eview[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v.  Thompkins* (1997), 78 Ohio St.3d 380, 387, quoting *State v.  Martin* (1983), 20 Ohio App.3d 172, 175.  While *Thompkins* explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded.  We have explained the limited role of an appellate court in reviewing issues of credibility in weight

of the evidence challenges as follows:

"Because the factfinder, be it the jury or * * * trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in *Thompkins*, *supra*, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence - in short, how persuasive it is. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, unreported."

*State v. Pierre,*

2d Dist.

Montgomery No.

18443,

2001

WL 220239

(March 2, 2001).

{¶ 28} The trial court noted that its decision was premised upon its assessment of the credibility of the witnesses, and since the trial court had the opportunity to observe and hear all of the witnesses, we extend substantial deference to the court's assessment of credibility. Lallemand and Moberly, whose testimony the trial court clearly credited, testified that Latham failed to pay for the furniture, and that extensive efforts to arrange for its return were unsuccessful. Lallemand identified the store's documented call history to Latham, from April 23, 2010, until June 12, 2010. Dixon's testimony about the repeated calls she received from Rent-A-Center further attests to the extensive collection efforts made by the store. Other than her self-serving testimony, which the trial court rejected, Latham provided no evidence that she attempted to arrange for the return of the furniture. We agree with the State that Latham's assertion that, while in prior instances Rent-A-Center promptly picked up items when Latham failed to pay, but failed to do so herein, lacks credibility. Accordingly, having weighed all of the evidence and all reasonable inferences, we cannot conclude that the trial court lost its way such that a new trial for Latham is

warranted. Since Latham's conviction is not against the manifest weight of the evidence, her third assignment of error is overruled.

{¶ 29}  All three assignments of error having been overruled, the judgment of the trial court is affirmed.

FAIN, J., concurs.

FROELICH, J., dissenting:

{¶ 30}  Appellant rented property from the complainant with an option to buy and did not honor her contract. Further, as found factually by the trial court, she was not cooperative in the store's attempts to retrieve its property.

{¶ 31}  The lease-purchase agreement (Exhibit 3) provided for an initial weekly term with renewals for the same period. If the lessee chose to acquire ownership through periodic payment, the agreement set out a method of calculating the total, including tax; further, the agreement provided an "early purchase option" within the first ninety days of the agreement or at any subsequent time based on set formulas.

{¶ 32}  There is no reference to any criminal liability for breach of the agreement; rather it contains provisions for late fees, reinstatement, right of repossession, arbitration and, in bold capital letters: "NOTICE: THIS LEASE PURCHASE AGREEMENT IS REGULATED BY STATE LAW AND MAY BE ENFORCED BY THE ATTORNEY GENERAL OR BY PRIVATE LEGAL ACTION."

{¶ 33}  Lease-purchase agreements are regulated by R.C. Chapter 1351. R.C. 1351.03(B) provides that "no lease-purchase agreement shall provide that the mere failure to return property constitutes probable cause for a criminal action."

{¶ 34}   In *State v. Ell*, 813 S.W.2d 26 (Mo. App. E.D. 1991), the court held that contracts which include provisions of "sale" in addition to terms of rental are not within the criminal protection of §578.150 RS Mo. 1986, citing *State v. Harrison*, 805 S.W.2d 241 (Mo. App. E.D. 1991).   This section prohibits "purposefully fail[ing] to return leased or rented property to the place and within the time specified in the agreement."   Similarly, it may be, especially in light of R.C. 2901.04(C)'s mandate to interpret criminal statutes narrowly and in favor of the accused, and the apparent inconsistency between R.C. 2913.02 and R.C. 1351.03, that theft of rental property does not pertain to lease-purchase agreements as opposed to simple rental contracts.

{¶ 35}   First, R.C. 2913.02 requires that theft be of "property or services."   R.C. 2913.02(B)(10) sets out the penalty for theft of "rental property," which is defined in R.C. 2913.01(W) as "personal property in which the right of possession and use of the property is for a short and possibly indeterminate term in return for consideration. . . ."   R.C. 2913.72(D)(1) defines "rentee" as the "person who pays consideration to a 'renter' ('a person who owns the property') for the use of the rented property."

{¶ 36}   Further, R.C. 2913.02 requires that a defendant knowingly and beyond the scope of the express or implied consent of the owner exert control over the property with the "purpose" to "deprive" the owner of it.   That is, the State must prove that it was Appellant's "specific intention," R.C. 2901.22(A), to "withhold property of another permanently. . ." R.C. 2913.01(C)(1), or to "accept, use, or appropriate. . .property. . .with purpose not to give proper consideration in return for the. . .property. . .and without reasonable justification or excuse for not giving proper consideration."   R.C. 2913.01(C)(3).

{¶ 37}   "Purpose" may always be found circumstantially and R.C. 2913.02(B)(10) requires that "evidence of intent to commit theft of rented property or rental services shall be determined pursuant to the provisions of section 2913.72 of the Revised Code."   That section, as set out in the majority opinion, states that the giving of false information at the time of the rental or the failure to return rented property after receiving a certified mail letter from the rentor, shall be considered evidence of intent to commit theft of rental property. R.C. 2913.72(A)(1)(2)(B).   The evidence in this case is that Appellant always gave correct information and that the certified letter was not received by her.

{¶ 38}   As provided in the statute, these are not the only methods in which "intent to commit theft of rental property" may be proved although there are improper means.   For example, in her closing argument, the prosecutor said "[Latham] has a prior conviction [apparently arising out of receiving food stamps and not reporting certain income] for theft. She clearly doesn't respect that when she owes money to someone, she has to pay it."   (Tr. 145, lines 20-22).   This was probably objectionable pursuant to Evid.R. 404(B), but there was no objection and in a trial to the court, we presume that such inadmissable argument was not considered.   *State v. Bays*, 87 Ohio St.3d 15, 27, 1999-Ohio-216, 716 N.E.2d 1126.

{¶ 39}   On the other hand, intentionally concealing, destroying or disposing of the property would be strong evidence of a purpose never to pay for it or return it.   Indeed, in *Marshall*, the rentee, after signing for the collection letter and after civil suit had been filed, once over the phone and once face-to-face at his home, explicitly refused to return the property.   We held that was sufficient evidence of purpose.   Specifically, "When defendant

told Rent-A-Center personnel that he would not return their property despite being in default of the rental agreement, this case went from being a civil collection of a debt to a criminal theft in violation of R.C. 2913.02(A)(2)." *Marshall* at ¶24.

**{¶ 40}** The only evidence here is that Latham had possession of the property, knew she was contractually obligated to pay for it or return it, and did neither. The complainant could have sued Appellant and received damages and repossessed the property, but rather chose (perhaps because its self-created sixty-day period of collection attempts had been unsuccessful) to utilize the criminal courts. A person's actions may result simultaneously in criminal and civil liability, but to find that merely not paying (whether for good cause or being an unrepentant deadbeat) for property obtained under a lease-purchase agreement is a crime would eviscerate much of contract and secured transaction jurisprudence and be inconsistent with the culpable mental states required by the Revised Code. Criminal courts must be extremely careful not to be used as collection agencies or to enable de facto debtors' prisons. Nehf, Effective Regulation of Rent-to-Own Contracts, 52 Ohio St. L.J. 751 (1991).

**{¶ 41}** I would find that there was insufficient evidence.

. . . . . . . . . .

Copies mailed to:

Michele D. Phipps
Mark A. Deters
Hon. Michael L. Tucker